# SOUTH CAROLINA *v.* GATHERS

No. 88–305.   Argued March 28, 1989—Decided June 12, 1989

BRENNAN, J., delivered the opinion of the Court, in which WHITE, MAR-SHALL, BLACKMUN, and STEVENS, JJ., joined.   WHITE, J., filed a con-curring opinion, *post*, p. 812.   O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and KENNEDY, J., joined, *post*, p. 812.   SCALIA, J., filed a dissenting opinion, *post*, p. 823.

*Donald J. Zelenka,* Chief Deputy Attorney General of South Carolina, argued the cause for petitioner. With him on the briefs were *T. Travis Medlock,* Attorney General, and *Charles M. Condon.*

*William Isaac Diggs* argued the cause for respondent. With him on the brief was *Joseph L. Savitz III.*\*

JUSTICE BRENNAN delivered the opinion of the Court.

Respondent Demetrius Gathers was convicted of murder and sentenced to death for the killing of Richard Haynes. The evidence at trial showed that Gathers and three companions encountered Haynes, a stranger to them, at a park

---

\*Briefs of *amici curiae* urging reversal were filed for the Center for Civil Rights et al. by *Clint Bolick, Jerald L. Hill,* and *Mark Bredemeier;* and for the Washington Legal Foundation et al. by *Richard K. Willard, Daniel J. Popeo,* and *Paul D. Kamenar.*

Briefs of *amici curiae* urging affirmance were filed for the NAACP Legal Defense and Educational Fund, Inc., et al. by *Julius LeVonne Chambers, George Kendall, Eric Schnapper,* and *Vivian Berger;* and for the South Carolina Public Defenders' Association et al. by *David I. Bruck* and *John H. Blume.*

Briefs of *amici curiae* were filed for the State of California et al. by *John K. Van de Kamp,* Attorney General of California, *Steve White,* Chief Assistant Attorney General, and *Michael D. Wellington* and *Frederick R. Millar, Jr.,* Supervising Deputy Attorneys General, *Don Siegelman,* Attorney General of Alabama, *John J. Kelly,* Chief State's Attorney of Connecticut, *Robert A. Butterworth,* Attorney General of Florida, *Michael J. Bowers,* Attorney General of Georgia, *Neil F. Hartigan,* Attorney General of Illinois, *Linley E. Pearson,* Attorney General of Indiana, *Frederic J. Cowan,* Attorney General of Kentucky, *J. Joseph Curran,* Attorney General of Maryland, *William L. Webster,* Attorney General of Missouri, *Brian McKay,* Attorney General of Nevada, *W. Cary Edwards,* Attorney General of New Jersey, *Hal Stratton,* Attorney General of New Mexico, *Lacy H. Thornburg,* Attorney General of North Carolina, *Robert H. Henry,* Attorney General of Oklahoma, *Dave Frohnmayer,* Attorney General of Oregon, *Mary Sue Terry,* Attorney General of Virginia, *Kenneth O. Eikenberry,* Attorney General of Washington, and *Joseph B. Meyer,* Attorney General of Wyoming; for the Mid-America Legal Foundation by *Joseph A. Morris;* for Barbara Babcock et al. by *Dean Hill Rivkin;* and for SOLACE et al. by *Paul L. Hoffman, Joan W. Howarth,* and *Michael Laurence.*

bench one evening. When Haynes rebuffed Gathers' attempt to initiate a conversation, Gathers and his friends assaulted Haynes, beating and kicking him severely and smashing a bottle over his head. Before leaving the scene, Gathers beat Haynes with an umbrella, which he then inserted into the victim's anus. Some time later Gathers apparently returned to the scene and stabbed Haynes with a knife.

Richard Haynes was about 31 years old and unemployed. For two years prior to his death he had been experiencing "some mental problems" and had been "in and out of [a] mental hospital" three times. App. 4. Although without formal religious training, Haynes considered himself a preacher and referred to himself as "Reverend Minister"; his mother testified that he would he would "tal[k] to people all the time about the Lord." *Id.*, at 5–6. He generally carried with him several bags containing articles of religious significance, including two Bibles, rosary beads, plastic statues, olive oil, and religious tracts. Among these items, on the evening of his murder, was a tract entitled "The Game Guy's Prayer." Relying on football and boxing metaphors, it extolled the virtues of the good sport. After Haynes was beaten, his assailants went through his belongings, looking (apparently in vain) for something worth stealing. In rummaging through his personal effects they scattered on the ground the contents of his wallet and bags, including the just-mentioned tract.

Gathers was tried in the Court of General Sessions for Charleston County, South Carolina. During the guilt phase the articles found at the scene of the crime were admitted into evidence without objection.* The jury found Gathers

---

*The objects found scattered around Haynes' body were, for the most part, admitted into evidence during the testimony of Charleston police officer Anthony Hazel. Record 768–790. At no time then, or otherwise during the guilt phase, was there any reference to the *content* of the papers Haynes had with him. For example, the following was the entire colloquy at the time many of the papers were admitted:

guilty of murder and first-degree criminal sexual conduct. All of the testimony and exhibits from the guilt phase were readmitted into evidence at the sentencing phase. The State presented no other evidence at the sentencing phase, but the prosecutor's closing argument included the following remarks, which are the basis for the present controversy:

"We know from the proof that Reverend Minister Haynes was a religious person. He had his religious items out there. This defendant strewn *[sic]* them across the bike path, thinking nothing of that.

"Among the many cards that Reverend Haynes had among his belongings was this card. It's in evidence. Think about it when you go back there. He had this *[sic]* religious items, his beads. He had a plastic angel. Of course, he is now with the angels now, but this defendant Demetrius Gathers could care little about the fact that he is a religious person. Cared little of the pain and agony he inflicted upon a person who is trying to enjoy one of our public parks.

"But look at Reverend Minister Haynes' prayer. It's called the Game Guy's Prayer. 'Dear God, help me to be a sport in this little game of life. I don't ask for any easy place in this lineup. Play me anywhere you need me. I only ask you for the stuff to give you one hundred percent of what I have got. If all the hard drives seem to come my way, I thank you for the compliment. Help me to remember that you won't ever let anything come my way that you and I together can't handle. And help me to take the bad break as part of the game. Help me

---

"Q. Okay . . . . What else?
"A. Point C, we found some personal papers.
"Q. Personal papers that appeared to belong to the victim?
"A. Yes, sir.
"Q. That would be State's Exhibit 19?
"A. Yes." *Id.,* at 782.
See also *id.,* at 787.

to understand that the game is full of knots and knocks and trouble, and make me thankful for them. Help me to be brave so that the harder they come the better I like it. And, oh God, help me to always play on the square. No matter what the other players do, help me to come clean. Help me to study the book so that I'll know the rules, to study and think a lot about the greatest player that ever lived and other players that are portrayed in the book. If they ever found out the best part of the game was helping other guys who are out of luck, help me to find it out, too. Help me to be regular, and also an inspiration with the other players. Finally, oh God, if fate seems to uppercut me with both hands, and I am laid on the shelf in sickness or old age or something, help me to take that as part of the game, too. Help me not to whimper or squeal that the game was a frameup or that I had a raw deal. When in the falling dusk I get the final bell, I ask for no lying, complimentary tombstones. I'd only like to know that you feel that I have been a good guy, a good game guy, a saint in the game of life.'

"Reverend Minister Haynes, we know, was a very smallˉperson. He had his mental problems. Unable to keep a regular job. And he wasn't blessed with fame or fortune. And he took things as they came along. He was prepared to deal with tragedies that he came across in his life.

   .      .      .      .      .

"You will find some other exhibits in this case that tell you more about a just verdict. Again this is not easy. No one takes any pleasure from it, but the proof cries out from the grave in this case. Among the personal effects that this defendant could care little about when he went through it is something that we all treasure. Speaks a lot about Reverend Minister Haynes. Very simple yet very profound. Voting. A voter's registration card.

"Reverend Haynes believed in this community. He took part. And he believed that in Charleston County, in the United States of America, that in this country you could go to a public park and sit on a public bench and not be attacked by the likes of Demetrius Gathers." *Id.*, at 41–43.

Finding that these "extensive comments to the jury regarding the victim's character were unnecessary to an understanding of the circumstances of the crime," the Supreme Court of South Carolina concluded that the prosecutor's remarks "conveyed the suggestion appellant deserved a death sentence because the victim was a religious man and a registered voter." 295 S. C. 476, 484, 369 S. E. 2d 140, 144 (1988). Relying on our decision in *Booth* v. *Maryland*, 482 U. S. 496 (1987), the court reversed Gathers' sentence of death and remanded for a new sentencing proceeding. We granted certiorari, 488 U. S. 888 (1988), and we now affirm.

Our capital cases have consistently recognized that "[f]or purposes of imposing the death penalty . . . [the defendant's] punishment must be tailored to his personal responsibility and moral guilt." *Enmund* v. *Florida*, 458 U. S. 782, 801 (1982). See also *id.*, at 825 (O'CONNOR, J., dissenting) ("[P]roportionality requires a nexus between the punishment imposed and the defendant's blameworthiness"); *Tison* v. *Arizona*, 481 U. S. 137, 149 (1987) ("The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender"). Two Terms ago, in *Booth* v. *Maryland*, *supra*, we addressed the question whether use of "victim impact statements" in capital sentencing proceedings violated this principle that a sentence of death must be related to the moral culpability of the defendant. We held that such statements introduced factors that might be "wholly unrelated to the blameworthiness of a particular defendant." 482 U. S., at 504.

The statements placed before the jury in *Booth* included descriptions of the victims' personal characteristics, state-

ments concerning the emotional impact of the crime on the victims' family, and the family members' opinions about the crime and the defendant. At issue in the present case is a statement of the first sort—one concerning personal characteristics of the victim. While in this case it was the prosecutor rather than the victim's survivors who characterized the victim's personal qualities, the statement is indistinguishable in any relevant respect from that in *Booth*. As in *Booth*, "[a]llowing the jury to rely on [this information] . . . could result in imposing the death sentence because of factors about which the defendant was unaware, and that were irrelevant to the decision to kill." *Id.*, at 505.

Our opinion in *Booth*, however, left open the possibility that the kind of information contained in victim impact statements could be admissible if it "relate[d] directly to the circumstances of the crime." *Id.*, at 507, n. 10. South Carolina asserts that such is the case here. Brief for Petitioner 25–41. It contends that the various personal effects which were "maliciously strewn around [the victim's] body during the event" were "relevant to the circumstances of the crime or reveal certain personal characteristics of the defendant." *Id.*, at 28.

We disagree. The fact that Gathers scattered Haynes' personal papers around his body while going through them looking for something to steal was certainly a relevant circumstance of the crime, and thus a proper subject for comment. But the prosecutor's argument in this case went well beyond that fact: he read to the jury at length from the religious tract the victim was carrying and commented on the personal qualities he inferred from Haynes' possession of the "Game Guy's Prayer" and the voter registration card. The *content* of these cards, however, cannot possibly have been relevant to the "circumstances of the crime." There is no evidence whatever that the defendant read anything that was printed on either the tract or the voter card. Indeed, it is extremely unlikely that he did so. The testimony at trial

was that Gathers went through Haynes' bags very quickly, "just throwing [his belongings] everywhere, looking through things," App. 27, and that he spent not more than a minute doing so, *id.*, at 28. The crime took place, moreover, at night, along a dark path through a wooded area. *Id.*, at 17; Record 621–622, 926–927. Nor did the assailants have flashlights. *Id.*, at 622–623. Under these circumstances, the content of the various papers the victim happened to be carrying when he was attacked was purely fortuitous and cannot provide any information relevant to the defendant's moral culpability. Notwithstanding that the papers had been admitted into evidence for another purpose, their content cannot be said to relate directly to the circumstances of the crime.

The judgment of the Supreme Court of South Carolina is therefore

*Affirmed.*

JUSTICE WHITE, concurring.

Unless *Booth* v. *Maryland*, 482 U. S. 496 (1987), is to be overruled, the judgment below must be affirmed. Hence, I join JUSTICE BRENNAN's opinion for the Court.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE and JUSTICE KENNEDY join, dissenting.

In *Booth* v. *Maryland*, 482 U. S. 496 (1987), this Court held that the Eighth Amendment prohibited a jury from considering a victim impact statement during the sentencing phase of a capital trial. The document at issue in *Booth* was compiled by the Maryland Division of Parole and Probation on the basis of extensive interviews with the two murder victims' son, daughter, son-in-law, and granddaughter. In addition to evidence relating to the personal qualities of the victims themselves, the statement in *Booth* described the emotional impact of the crime on the victims' family members, including their resulting sleeplessness, fear, depression, and constant painful memories. The statement also de-

scribed the family members' opinions about the crime, the defendant, and the proper penalty to be imposed. *Id.*, at 509–515. The majority in *Booth* took the view that such information "may be wholly unrelated to the blameworthiness of a particular defendant," *id.*, at 504, and could divert the capital sentencer's attention from the circumstances of the crime and the defendant's background and record, *id.*, at 505. The majority noted that introduction of evidence of a victim's good character would entitle the defendant to rebut this evidence, resulting in "a 'mini-trial' on the victim's character." *Id.*, at 507. The Court also expressed concern that the opinions of family members regarding the crime and the defendant could serve to "inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.*, at 508.

Since our decision in *Booth*, there has been considerable confusion in the lower courts about the precise scope of its holding. Some courts, like the South Carolina Supreme Court in this case, have read *Booth* for the broad proposition that "the injection of the victim's personal characteristics into the sentencing determination" violates the Eighth Amendment. 295 S. C. 476, 484, 369 S. E. 2d 140, 144 (1988). Other courts have declined to read *Booth* so broadly, holding that it does not prohibit prosecutorial argument at the penalty phase concerning the personal characteristics of the victim. See, *e. g.*, *Daniels* v. *State*, 528 N. E. 2d 775, 782 (Ind. 1988); *Moon* v. *State*, 258 Ga. 748, 756, 375 S. E. 2d 442, 450 (Ga. 1988). See also *People* v. *Rich*, 45 Cal. 3d 1036, 1089–1090, 755 P. 2d 960, 993–994 (1988); *People* v. *Ghent*, 43 Cal. 3d 739, 771–772, 739 P. 2d 1250, 1271 (1987).

I joined both dissents in *Booth*, see *Booth*, 482 U. S., at 515 (WHITE, J., dissenting); *id.*, at 519 (SCALIA, J., dissenting), believing that the case was wrongly decided on its facts and rested on a misinterpretation of the Eighth Amendment and this Court's cases thereunder. Although I remain persuaded that *Booth* was wrong when decided and stand ready

to overrule it if the Court would do so, we can reach a proper
disposition in this case without such action. *Booth*'s cen-
tral holding that statements about the harm to a victim's fam-
ily have no place in capital sentencing does not control the
case before us today. At issue here are solely prosecutorial
comments about the victim himself. Thus, we must decide
whether to adopt a broad reading of *Booth* as establishing a
rigid Eighth Amendment rule eliminating virtually all consid-
eration of the victim at the penalty phase, or a narrower
reading of that decision which would allow jury consideration
of information about the victim and the extent of the harm
caused in arriving at its moral judgment concerning the ap-
propriate punishment. See *Mills* v. *Maryland*, 486 U. S.,
367, 398 (1988) (REHNQUIST, C. J., dissenting) ("I do not in-
terpret *Booth* as foreclosing the introduction of all evidence,
in whatever form, about a murder victim").

Because the Eighth Amendment itself requires "that the
penalty imposed in a capital case be proportional to the harm
caused and the defendant's blameworthiness," *Enmund* v.
*Florida*, 458 U. S. 782, 823 (1982) (O'CONNOR, J., dissent-
ing), I would reject a rigid Eighth Amendment rule which
prohibits a sentencing jury from hearing argument or consid-
ering evidence concerning the personal characteristics of the
victim. I would thus reverse the judgment of the South Car-
olina Supreme Court in this case. I also would decline re-
spondent's invitation that this Court comb the record for indi-
cations that the prosecutor "misrepresented the evidence" in
his closing argument or appealed to religious bias in violation
of the Due Process Clause of the Fourteenth Amendment.
See Brief for Respondent 21–24. Instead, I would remand
the case to the South Carolina Supreme Court for that par-
ticular inquiry.

I

On a Saturday evening in September 1986, Richard Haynes
sat peacefully on a park bench near his mother's home
with a Bible and various religious items at his side. A

vulnerable man with a history of mental problems, Haynes called himself "Reverend Minister" and shared his religious views with those who would listen. Haynes was approached by respondent Demetrius Gathers and three companions who sat down on the bench next to him and drank beer. After Haynes told Gathers he did not wish to converse with him, Gathers and two of his companions beat Haynes brutally, and Gathers smashed a bottle over his head. App. 18–22. As Haynes lay helpless, Gathers and one of his compatriots rummaged through the various religious and other items in Haynes' possession, strewing them around on the ground as they looked for something to steal. *Id.*, at 27–28, 34–35. Gathers' companions then left, but Gathers remained at the scene striking the unconscious Haynes with an umbrella and then forcing the umbrella into his anus. *Id.*, at 23–26. Gathers then departed and walked to a nearby apartment complex. *Id.*, at 26. Sometime later, Gathers and one other companion returned to the park with a knife. Gathers admitted that he then stabbed Haynes to death. *Id.*, at 30, 36.

At Gathers' trial for murder and criminal sexual conduct, Richard Haynes' mother testified without objection about her son's mental problems and his practice of carrying a Bible and other religious items and "talk[ing] to people all the time about the Lord." *Id.*, at 5. One of Gathers' companions testified that Haynes' Bible was clearly visible on the park bench as they approached him on the night of the murder. *Id.*, at 26–27. All the items Haynes carried with him that night—including olive oil, plastic angels, rosary beads, two Bibles, a voter registration card, and the "Game Guy's Prayer"—were introduced into evidence without objection during the guilt phase of the trial. *Id.*, at 8–10; Record 565–567, 782–783, 785–787. Those items were reintroduced into evidence without objection at the penalty phase. *Id.*, at 1167.

The jury convicted respondent of murder and first degree criminal sexual conduct. During his closing argument at the penalty phase, the prosecutor referred to the fact that Richard Haynes was a religious person as well as a vulnerable man with mental problems who was unable to keep a regular job. The prosecutor referred to several of the religious items that had been introduced into evidence. He also read the "Game Guy's Prayer" in its entirety, suggesting that Haynes was the sort of person who "took things as they came along" and "was prepared to deal with tragedies that he came across in his life." App. 43. The prosecutor also referred to Haynes' voter registration card found beside his body, arguing that the card "[s]peaks a lot about Reverend Minister Haynes" who "believed in this community" and believed "that in this country you could go to a public park and sit on a public bench and not be attacked by the likes of Demetrius Gathers." *Ibid.*

The sentencing jury was then given instructions which are not challenged here and returned a recommendation that the death sentence be imposed. The South Carolina Supreme Court reversed Gathers' death sentence, finding that the prosecutor's closing argument at the sentencing proceeding violated the Eighth Amendment "by focusing extensively on the personal characteristics of the victim." 295 S. C., at 482, 369 S. E. 2d, at 143.

## II

*Booth* should not be read, in my view, to preclude prosecutorial comment which gives the sentencer a "glimpse of the life" a defendant "chose to extinguish." *Mills* v. *Maryland, supra,* at 397 (REHNQUIST, C. J., dissenting). "The fact that there is a victim, and facts about the victim properly developed during the course of the trial, are not so far outside the realm of 'circumstances of the crime' that mere mention will always be problematic." *Brooks* v. *Kemp,* 762 F. 2d 1383, 1409 (CA11 1985) (en banc), vacated on other grounds, 478 U. S. 1016 (1986), judgment reinstated, 809 F. 2d 700

(CA11) (en banc), cert. denied, 483 U. S. 1010 (1987). In my view, nothing in the Eighth Amendment precludes the prosecutor from conveying to the jury a sense of the unique human being whose life the defendant has taken.

More fundamentally, this case illustrates the one-sided nature of the moral judgment that the Court's broad reading of *Booth* would require of the capital sentencer. This Court has consistently required that a jury at the penalty phase be allowed to consider a wide range of information concerning the background of the defendant. Thus, not merely the circumstances of the crime are relevant, but as we stated in *Lockett* v. *Ohio*, 438 U. S. 586, 604 (1978): "[T]he Eighth and Fourteenth Amendments require that the sentencer . . . not be precluded from considering, *as a mitigating factor*, any aspect of a defendant's character or record . . . that the defendant proffers as a basis for a sentence less than death" (emphasis in original; footnote omitted). See also *Eddings* v. *Oklahoma*, 455 U. S. 104 (1982). Our decisions in *Lockett* and *Eddings* were based on the proposition that the decision of the capital sentencer is a profoundly moral one and must reflect the moral judgment of the community regarding the proper penalty to be inflicted on a particular individual for his or her actions. Evidence extraneous to the crime itself is deemed relevant and indeed, constitutionally so, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse." *California* v. *Brown*, 479 U. S. 538, 545 (1987) (O'CONNOR, J., concurring). In this case, the sentencing jury heard testimony from respondent's mother, his sister, and his cousin, all indicating that he was an affectionate and caring person. Record 1183, 1187, 1199. Gathers' sixth grade teacher testified that he was a quiet and affectionate child but that he was not given sufficient guidance and discipline at home. *Id.*, at 1193, 1195. None of this evidence was directly relevant to

the events of September 13, 1986, but all of it was relevant to the jury's assessment of respondent himself and his moral blameworthiness.

Similarly, one of the factors that has long entered into society's conception of proper punishment is the harm caused by the defendant's actions. Thus, we have long recognized that retribution itself is a valid penological goal of the death penalty. See *Gregg* v. *Georgia*, 428 U. S. 153, 183 (1976) (opinion of Stewart, Powell, and STEVENS, JJ.). Indeed, we have expressly noted that while "retribution is an element of all punishments society imposes," it "clearly plays a more prominent role in a capital case." *Spaziano* v. *Florida*, 468 U. S. 447, 462 (1984). "The heart of the retribution rationale is that a criminal sentence must be directly related to the personal culpability of the criminal offender." *Tison* v. *Arizona*, 481 U. S. 137, 149 (1987). Moreover, one essential factor in determining the defendant's culpability is the extent of the harm caused.

That the harm caused by a defendant's actions is relevant to the capital sentencer's moral judgment concerning the appropriate penalty, even if the defendant did not specifically intend that harm, is a principle recognized both in the decisions of this Court and in legislative decisions concerning appropriate levels of punishment. In *Tison* v. *Arizona*, *supra*, we held that the Eighth Amendment did not preclude imposing the death penalty on two brothers who participated substantially in their father's armed prison breakout and in a related kidnaping and robbery that resulted in four murders, even though neither defendant "took any act which he desired to, or was substantially certain would, cause death." *Id.*, at 150. We found that the Tisons' involvement in the crime was such that "both subjectively appreciated that their acts were likely to result in the taking of innocent life," *id.*, at 152, and that "the record would support a finding of the culpable mental state of reckless indifference to human life," *id.*, at 151. We noted that "reckless indifference to the value of

human life may be every bit as shocking to the moral sense as an 'intent to kill,'" *id.*, at 157, and we remanded the case to the Supreme Court of Arizona for a specific determination whether the Tisons possessed that mental state, *id.*, at 158. What was critical to the defendants' eligibility for the death penalty in *Tison* was the harm they helped bring about: the death of four innocent human beings. In a similar manner, society punishes reckless driving differently from vehicular homicide; the distinction rests not on any difference in the defendant's mental state but on the notion that one of the legitimate concerns of any sentencer is the harm that the defendant's actions have caused. See *Booth*, 482 U. S., at 516 (WHITE, J., dissenting) ("There is nothing aberrant in a juror's inclination to hold a murderer accountable not only for his internal disposition in committing the crime but also for the full extent of the harm he caused"). In the death penalty context, no State authorizes infliction of the penalty for attempted murder, yet the criminal defendant who has attempted to kill another human being has the same mental state as the actual killer. Indeed, as JUSTICE SCALIA noted in dissent in *Booth*, the difference between murder and attempted murder may often hinge on a fortuity over which the defendant has no control at all. See *id.*, at 519. The only distinction is the harm to the community which results from the defendant's actions, and this distinction is deemed sufficient to support a difference in punishment between a sentence of years and the ultimate penalty.

Nothing in the Eighth Amendment precludes a State, if it chooses, from "includ[ing] as a sentencing consideration the particularized harm that an individual's murder causes to the rest of society," *id.*, at 517 (WHITE, J., dissenting). Indeed, precisely because the harm caused to society by a particular victim's death is relevant to society's moral judgment concerning the proper punishment, I would decline to read *Booth* for the broad proposition that the victim's personal characteristics are irrelevant at the sentencing phase of

a capital trial. A rigid Eighth Amendment rule which excludes all such considerations is not supported by history or societal consensus, and it withholds information which a State may clearly deem relevant to the reasoned moral judgment of a capital sentencer.

Thus, I would reverse the judgment of the South Carolina Supreme Court on this issue. In his closing argument in this case, the prosecutor focused on the heinous nature of respondent's crime. App. 40–41. The prosecutor brought the jury's attention to the fact that Richard Haynes was a religious person whose religious belongings were callously ransacked by Gathers during the attack. *Id.*, at 41. The prosecutor commented on some of the specific items introduced into evidence, and he read the "Game Guy's Prayer," which was found at the scene of the murder. That "Prayer," which invokes sports metaphors and stresses the virtues of being an accepting and resilient "good sport" in the game of life, was used by the prosecutor to stress the vulnerability and simple humanity of the victim. As the prosecutor argued: "Reverend Minister Haynes, we know, was a very small person. He had his mental problems. Unable to keep a regular job. And he wasn't blessed with fame or fortune." *Id.*, at 42. The prosecutor also commented on the victim's possession of a voter registration card at the time of his death, indicating that it "[s]peaks a lot about Reverend Minister Haynes," and exemplified the victim's "belie[f] in this community." In sum, the prosecutor stressed that the victim was an ordinary citizen who trusted that he could sit quietly on a public park bench without the risk of death.

In my view, no aspect of the prosecutor's argument in this case violated the Eighth Amendment. The jury found at the guilt phase that Gathers made a conscious decision to kill another human being. Just as Gathers' own background was important to the jury's assessment of him as a "uniquely individual human bein[g]," see *Woodson* v. *North Carolina*, 428 U. S. 280, 304 (1976), so information about his equally unique

victim was relevant to the jury's assessment of the harm he had caused and the appropriate penalty. Nothing in the Eighth Amendment precludes the community from considering its loss in assessing punishment nor requires that the victim remain a faceless stranger at the penalty phase of a capital trial. That the victim in this case was a deeply religious and harmless individual who exhibited his care for his community by religious proselytization and political participation in its affairs was relevant to the community's loss at his demise, just as society would view with grief and anger the killing of the mother or father of small children. See *Booth, supra,* at 516 (WHITE, J., dissenting). The Eighth Amendment stands as a shield against those practices and punishments which are either inherently cruel or which so offend the moral consensus of this society as to be deemed "cruel and unusual." *Trop* v. *Dulles,* 356 U. S. 86, 101 (1958). Because neither aspect of the Eighth Amendment was offended by the prosecutor's remarks, I would reverse the judgment below.

### III

As an alternative ground supporting the judgment below, Gathers argues that the prosecutor engaged in "manipulation of the evidence and outright fabrication" in his portrait of the victim's personal characteristics based on inferences from the "Game Guy's Prayer" and the voter registration card. Brief for Respondent 22. Gathers also contends that the prosecutor's closing argument impermissibly invited the jury to impose the death sentence on the basis of the victim's religion and political affiliation in violation of the Due Process Clause. *Id.,* at 23. It would indeed be improper for a prosecutor to urge that the death penalty be imposed *because* of the race, religion, or political affiliation of the victim. As JUSTICE WHITE wrote in dissent in *Booth,* "It is no doubt true that the State may not encourage the sentencer to rely on a factor such as the victim's race in determining whether the death penalty is appropriate. Cf. *McCleskey* v. *Kemp,* 481 U. S.

279 (1987)." *Booth*, 482 U. S., at 517. See also *Zant* v. *Stephens*, 462 U. S. 862, 885 (1983) (if a State "attached the 'aggravating' label to factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as for example the race, religion, or political affiliation of the defendant . . . due process of law would require that the jury's decision to impose death be set aside"); *Furman* v. *Georgia*, 408 U. S. 238, 242 (1972) (Douglas, J., concurring); *Brooks* v. *Kemp*, 762 F. 2d, at 1409.

Evaluation of Gathers' claim requires consideration of the entire record to determine whether any allegedly erroneous or improper remarks so infected the entire proceedings with unfairness as to render the resulting sentence a denial of due process. See *Donnelly* v. *DeChristoforo*, 416 U. S. 637, 643 (1974); *Darden* v. *Wainwright*, 477 U. S. 168 (1986). Because the "Game Guy's Prayer" was already in evidence without objection and could have been read by the jury even if the prosecutor never mentioned it, the prosecutor's reading of that document during his closing argument may constitute harmless error. Nevertheless, I would remand this case to the South Carolina Supreme Court to conduct this inquiry in the first instance.

Gathers also argues that he did not have the opportunity to rebut the prosecutor's positive statements about the victim's characteristics, and thus that his death sentence violates the dictates of *Gardner* v. *Florida*, 430 U. S. 349, 362 (1977) (opinion of STEVENS, J.) (due process precludes imposition of the death penalty on the basis of information in a presentence report which the defendant had no opportunity to rebut). Brief for Respondent 18–20. "No doubt a capital defendant must be allowed to introduce relevant evidence in rebuttal to a victim impact statement." *Booth*, 482 U. S., at 518 (WHITE, J., dissenting); *id.*, at 506–507 (opinion of the Court). In this case, however, respondent has pointed to no evidence introduced at the penalty phase that he was precluded from rebutting. Rather, the prosecutor commented

upon evidence introduced without objection at the guilt phase of the trial and drew various inferences from that evidence. Just as the prosecutor could comment upon evidence in the record about the victim during his closing argument, so could defense counsel. In fact, defense counsel did comment upon the prosecutor's repeated reference to Haynes as "Reverend Minister." App. 45. But, like respondent's other due process claim, this issue is best addressed by the South Carolina Supreme Court on remand. Because the majority instead adopts an Eighth Amendment barrier to virtually any discussion of the victim's personal characteristics at the penalty phase of a murder trial, I respectfully dissent.

JUSTICE SCALIA, dissenting.

Two Terms ago, when we decided *Booth* v. *Maryland*, 482 U. S. 496 (1987), I was among four Members of the Court who believed that the decision imposed a restriction upon state and federal criminal procedures that has no basis in the Constitution. See *id.*, at 515 (WHITE, J., dissenting); *id.*, at 519 (SCALIA, J., dissenting). I continue to believe that *Booth* was wrongly decided, and my conviction that it does perceptible harm has been strengthened by subsequent writings pointing out the indefensible consequences of a rule that the specific harm visited upon society by a murderer may not be taken into account when the jury decides whether to impose the sentence of death. See *ante*, at 816–820 (O'CONNOR, J., dissenting); *Mills* v. *Maryland*, 486 U. S. 367, 397 (1988) (REHNQUIST, C. J., dissenting). Once it is accepted, moreover, that the nature of the specific harm may be considered, I see no basis for drawing a distinction for Eighth Amendment purposes between the admirable personal characteristics of the particular victim and the particular injury caused to the victim's family and fellow citizens. Indeed, I would often find it impossible to tell which was which. (Would the fact that the victim was a dutiful husband and father be a personal characteristic or an indication of injury to others?) I

therefore think the present case squarely calls into question the validity of *Booth*, and I would overrule that case.

It has been argued that we should not overrule so recent a decision, lest our action "appear to be . . . occasioned by nothing more than a change in the Court's personnel," and the rules we announce no more than "'the opinions of a small group of men who temporarily occupy high office.'" Brief for Barbara Babcock et al. as *Amici Curiae* 29–30 (quoting *Florida Dept. of Health and Rehabilitative Services* v. *Florida Nursing Home Assn.*, 450 U. S. 147, 154 (1981) (STEVENS, J., concurring)). I doubt that overruling *Booth* will so shake the citizenry's faith in the Court. Overrulings of precedent rarely occur without a change in the Court's personnel. The only distinctive feature here is that the overruling would follow not long after the original decision. But that is hardly unprecedented. See, *e. g.*, *Daniels* v. *Williams*, 474 U. S. 327, 330–331 (1986) (overruling *Parratt* v. *Taylor*, 451 U. S. 527 (1981)); *United States* v. *Scott*, 437 U. S. 82, 86–87 (1978) (overruling *United States* v. *Jenkins*, 420 U. S. 358 (1975)); *West Virginia Board of Education* v. *Barnette*, 319 U. S. 624, 642 (1943) (overruling *Minersville School District Board of Education* v. *Gobitis*, 310 U. S. 586 (1940)). Indeed, I had thought that the respect accorded prior decisions increases, rather than decreases, with their antiquity, as the society adjusts itself to their existence, and the surrounding law becomes premised upon their validity. The freshness of error not only deprives it of the respect to which long-established practice is entitled, but also counsels that the opportunity of correction be seized at once, before state and federal laws and practices have been adjusted to embody it. That is particularly true with respect to a decision such as *Booth*, which is in that line of cases purporting to reflect "evolving standards of decency" applicable to capital punishment. *Trop* v. *Dulles*, 356 U. S. 86, 101 (1958) (plurality opinion). Once a law-abiding society has revised its laws and practices to comply with such an erroneous decision,

the existence of a new "consensus" can be appealed to—or at least the existence of the pre-existing consensus to the contrary will no longer be evident—thus enabling the error to triumph by our very failure promptly to correct it. Cf. *Thompson* v. *Oklahoma*, 487 U. S. 815, 854–855 (1988) (O'CONNOR, J., concurring in judgment).

In any case, I would think it a violation of my oath to adhere to what I consider a plainly unjustified intrusion upon the democratic process in order that the Court might save face. With some reservation concerning decisions that have become so embedded in our system of government that return is no longer possible (a description that surely does not apply to *Booth*), I agree with Justice Douglas: "A judge looking at a constitutional decision may have compulsions to revere past history and accept what was once written. But he remembers above all else that it is the Constitution which he swore to support and defend, not the gloss which his predecessors may have put on it." Douglas, Stare Decisis, 49 Colum. L. Rev. 735, 736 (1949). Or as the Court itself has said: "[W]hen convinced of former error, this Court has never felt constrained to follow precedent. In constitutional questions, where correction depends upon amendment and not upon legislative action this Court throughout its history has freely exercised its power to reexamine the basis of its constitutional decisions." *Smith* v. *Allwright*, 321 U. S. 649, 665 (1944).

*Booth* has not even an arguable basis in the common-law background that led up to the Eighth Amendment, in any longstanding societal tradition, or in any evidence that present society, through its laws or the actions of its juries, has set its face against considering the harm caused by criminal acts in assessing responsibility. The Court's opinion in *Booth*, like today's opinion, did not even try to assert the contrary. We provide far greater reassurance of the rule of law by eliminating than by retaining such a decision.

I respectfully dissent.