Alton COLEMAN, Appellant
(Defendant Below),

v.

STATE of Indiana, Appellee
(Plaintiff Below).

No. 45S00–8610–CR–937.

Supreme Court of Indiana.

Aug. 24, 1990.

Rehearing Denied Oct. 23, 1990.

James F. Stanton, Appellate Div., Crown Point, for appellant.

Linley E. Pearson, Atty. Gen., Arthur Thaddeus Perry, Deputy Atty. Gen., Indianapolis, for appellee.

SHEPARD, Chief Justice.

Appellant Alton Coleman was found guilty by a jury of murder, a felony, Ind. Code § 35–42–1–1(1) (Burns 1985 Repl.), attempted murder, a class A felony, Ind.Code §§ 35–41–5–1, 35–42–1–1 (Burns 1985 Repl.), and child molesting, a class A felony, Ind.Code § 35–42–4–3(a) (Burns 1985 Repl.). The jury also recommended the death penalty.[1] Judge Richard Maroc entered lengthy findings and sentenced Coleman to death.

In June 1984, Coleman and his companion Deborah Brown approached two young girls in Gary. The girls were ten-year-old A.H. and her seven-year-old niece, Tamika Turk. They enticed the girls into a wooded area with a friendly offer of clothing. Once there, Coleman told the girls that he was going to play a game. He then took off Tamika Turk's pink shirt, cut it into shreds with a pocket knife, and tied both girls' hands, mouths and legs.

Tamika began crying. Coleman responded by stomping viciously on her face, chest and stomach with his foot. Afterward, Coleman and Brown carried Tamika away. A.H. testified that Tamika was not breathing when Coleman and Brown carried her away. Tamika's body was later discovered with a piece of bed clothing tied around her neck.

Coleman next forced A.H. to perform oral sex on him and on Brown. While A.H. was performing oral sex on Brown, Coleman raped A.H. Finally, Coleman and Brown simultaneously strangled A.H. with their belts until she passed out. Incredibly, A.H. regained consciousness and walked out of the wooded area. A young woman and her mother noticed A.H., took her in, and eventually called an ambulance.

---

1. The State sought death on two grounds: murder while committing or attempting child molesting, Ind.Code § 35–50–2–9(b)(1), and after having been convicted of another murder, Ind. Code § 35–5–2–9(b)(7). In 1985, Coleman was convicted of two counts of murder and sentenced to death in Hamilton County, Ohio, under cause numbers B–843548 and B–843559.

At the hospital, doctors discovered cuts so deep in A.H.'s vaginal area that her intestines were protruding into her vagina.

Coleman appeals, raising four issues:

I. Whether the trial court committed fundamental error by permitting the victim's grandmother to testify at the sentencing hearing, violating the eighth amendment as interpreted in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987).

II. Whether prosecutorial misconduct denied Coleman his right to due process and a fair trial.

III. Whether the trial court erred by permitting A.H. to identify Coleman at trial after allegedly improper pre-trial photographic displays and identification procedures.

IV. Whether Indiana's death sentence statute violates the eighth and fourteenth amendments because it gives prosecutors the arbitrary power to choose against whom to seek the death penalty.

### I. *Victim Impact Evidence*

Coleman argues that the State presented evidence of the impact of his crimes on the victims and testimony by a family member concerning the propriety of the death penalty, contrary to the dictates of the eighth amendment as interpreted in *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), and *South Carolina v. Gathers,* — U.S. ——, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989).

Mary Lee Hilland, mother of A.H. and grandmother of Tamika, testified for the State at Coleman's sentencing hearing before Judge Maroc. The jury neither heard nor considered her testimony. Hilland told the court that A.H. had become withdrawn and suffered nightmares. She testified that she herself had attempted suicide and offered her opinion that Coleman should die for murdering Tamika.

█ We begin by considering the applicability of *Booth* and *Gathers* to Coleman's case, which was tried before either of those two decisions was issued. The Florida Supreme Court has recently held that the stringent evidentiary pronouncements in *Booth* and *Gathers* represented such a significant change in the constitutional rules of capital sentencing that fairness requires retroactive application of the rules contained in those two opinions to cases on direct appeal in which an adequate objection was lodged at trial. *Parker v. Dugger,* 550 So.2d 459 (1989); *Jackson v. Dugger,* 547 So.2d 1197 (1989). We concur in this assessment and hold that *Booth* and *Gathers* apply to the direct appeal of a trial occurring before those cases were decided so long as the appellant has preserved a victim impact issue by objecting at trial.

The Attorney General argues that Coleman has waived the issue by failing to object a trial. The record reveals that Coleman objected on relevance grounds to the most compelling portion of Hilland's testimony, her own attempt at suicide upon hearing A.H.'s story. We conclude that Coleman has preserved his claim under *Booth* and *Gathers.*

As for the merits of Coleman's claim, we note that the victim impact statement condemned in *Booth* contained two sorts of information. First, it portrayed the personal characteristics of the victims and described the impact of the crime on members of the deceased couple's family. Second, it offered the family members' opinions about the seriousness of the crime and their views on the appropriate penalty. Writing for a majority of five, Justice Powell declared that only so much of this information as might be relevant to an offender's "personal responsibility and moral guilt" may be used in making a capital decision. *Booth,* 482 U.S. at 502, 107 S.Ct. at 2533. Justice Powell asserted that murderers frequently do not know their victims and rarely select a victim based on whether the murder will have an impact on anyone other than the person murdered. While acknowledging that a murderer who acts with a high degree of knowledge of the likely consequences of his acts might be morally more culpable, Justice Powell concluded that Maryland's statute providing for victim impact statements generated documentary evidence which would frequently be unknown to the murderer and

irrelevant to the decision to kill. As for the victim impact statement's sections in which the family members characterized the butchery of the crime and called for execution of the perpetrator, Justice Powell declared that its introduction "can serve no other purpose than to inflame the jury and divert it from deciding the case on the relevant evidence concerning the crime and the defendant." *Id.*, at 508, 107 S.Ct. at 2536.

In *South Carolina v. Gathers*, the Court extended this view of relevance from the victim impact statement to testimentary evidence. Justice Brennan declared that a prayer card and a voter registration card carried in the victim's wallet and strewn about in the dark as the murderer searched for money were apparently unknown to the murderer (as the victim was a stranger) and thus irrelevant to the sentencing decision to be made by the South Carolina jury. *Gathers*, 104 L.Ed.2d at 876.

■ Under this test of relevance, some of Mary Lee Hilland's testimony was proper under the eighth amendment. Hilland testified that A.H. had become somewhat withdrawn and suffered nightmares as the result of watching her niece be stomped to death and being sexually assaulted herself. We view these as straightforward and readily anticipated results of a vicious attack on two young girls. They are hardly "factors about which the defendant was unaware." *Id.* Admitting this testimony did not violate the eighth amendment.

■ Hilland's statement about her own attempt at suicide and her assertion that Coleman should be executed, by contrast, were irrelevant under the definition announced in *Booth* and *Gathers*. Had this irrelevant and highly personal testimony been submitted to a jury which would make the final decision concerning execution or a term of years, it could well be argued that its admission would "create the risk that a death sentence will be based on considerations that are 'constitutionally impermissible or totally irrelevant to the sentencing

process.'" *Booth*, 482 U.S. at 502, 107 S.Ct. at 2533, quoting *Zant v. Stephens*, 462 U.S. 862, 885, 103 S.Ct. 2733, 2747, 77 L.Ed.2d 235, 255 (1983).

■ Of course, Hilland's testimony on these two points was not heard by a sentencing jury. Instead, it was presented to the sentencing court. We generally presume that in a proceeding tried to the bench a court renders its decisions solely on the basis of relevant and probative evidence. Our colleagues in Ohio have reached the same conclusion in assessing the impact of *Booth* on sentencing by judges. *State v. Post*, 32 Ohio St.3d 380, 513 N.E.2d 754 (1987), *cert. denied*, 484 U.S. 1079, 108 S.Ct. 1061, 98 L.Ed.2d 1023 (1988) (absent indication that sentencing judges relied on *Booth* information, death sentence will be upheld).

Indiana's requirement of written findings by the sentencing judge serves us well under these circumstances. As he has in the past, Judge Maroc has issued a particularly thoughtful and well written set of findings and conclusions to explain why he chose to impose the death penalty. There is no indication in this twelve-page memorial that the trial court relied on Hilland's testimony. Rather, Judge Maroc focused on the overwhelming evidence demonstrating commission of the crime and Coleman's moral blameworthiness for it. Admitting Hilland's testimony under these circumstances does not violate the eighth amendment.

## II. *Prosecutorial Misconduct*

■ Coleman argues that prosecutorial misconduct by Thomas Vanes, the lead prosecutor in this case, denied Coleman a fair trial and his right to due process as guaranteed by art. I, §§ 12, 13, and 14 of the Indiana Constitution and the fifth, sixth and fourteenth amendments to the U.S. Constitution.[2] He asserts that this misconduct warrants reversal of his conviction and a new trial. After a day of the defense's presentation of evidence, Vanes

---

**2.** Coleman only mentions the Indiana Constitution in passing. For lack of any substantive argument, he waives his state constitutional argument. *St. John v. State* (1988), Ind., 523 N.E.2d 1353.

wrote a note and posted it in the elevator used to take Coleman from the courtroom to his jail cell. The note said:

Pissy

You got

the balls

(ball) to testify ???

The note referred to Coleman's childhood nickname, which he disliked, and that Coleman had only one testicle. The discovery of this note caused a consternation. The court allowed Coleman some time to decide whether to testify. Vanes apologized to the court and withdrew from the case. The trial judge held him in contempt; the record does not reveal the imposition of any sanction.

■ This note was far outside the boundaries of reasonable conduct for a prosecutor, to say the least. The trial court properly held Vanes in contempt, but this is not the sort of violation of the Code of Professional Responsibility for which a finding alone is a sufficient sanction. We direct the trial court to enter an appropriate sanction on its finding of contempt if it has not already done so.

Coleman asserts that this note so upset him that he was unable to decide whether to testify. He claims Vanes' actions were so egregious that they offend the principles of justice rooted in our traditions and conscience, citing *Rochin v. California,* 342 U.S. 165, 72 S.Ct. 205, 96 L.Ed. 183 (1952), and *Snyder v. Massachusetts,* 291 U.S. 97, 54 S.Ct. 330, 78 L.Ed. 674 (1934). Coleman also cites *Maldonado v. State* (1976), 265 Ind. 492, 355 N.E.2d 843, for the proposition that Vanes' note placed him in "grave peril" therefore entitling him to a reversal and a new trial.

In the wake of Vanes' misconduct and Coleman's motion for a mistrial, the trial court conducted an extensive hearing. Judge Maroc appointed two psychiatrists to interview Coleman about the incident and report about its effect on him. They testified that the note had little or no effect

Coleman's capacity to participate in his trial and make decisions concerning it.[3] The court also heard testimony from the two officers who were with Coleman when he saw the note. One testified that Coleman seemed shaken up by it and somewhat paranoid thereafter. By contrast, the other officer testified that Coleman laughed when he saw the note and did not seem upset.

The activities described above consumed some seven hours. When they were concluded, the trial court denied Coleman's motion for a mistrial. Asked whether he would made a finding on whether the note had any impact on Coleman's decision about taking the stand, Judge Maroc said: "I will make a finding on that. I don't think it has an effect." He explained further: "I feel that the decision as to whether or not to testify is as difficult for the defendant today as it was yesterday but that this has not had an effect on that of constitutional proportions." Record at 2142. The court recessed until the next day.

■ Coleman has correctly identified the precedent applicable to a motion for mistrial based on prosecutorial misconduct. A mistrial is appropriate if the prosecutor has violated the norms of professional conduct and placed the defendant in a position of grave peril. *Maldonado,* 265 Ind. 492, 355 N.E.2d 843. The gravity of the peril is measured by its likely effect on the jury. *Swope v. State* (1975), 263 Ind. 148, 325 N.E.2d 193.

The jury never knew about Vanes' note. The trial court carefully examined the impact of the note and concluded that it had no effect. Our review of the record persuades us that this conclusion is correct. We can understand the possibility that Coleman might have suffered some distress over the message contained in the note. The psychiatrists and the trial judge concluded that the effect on Coleman's ability to decide whether to testify was minimal or nonexistent. That being so, Cole-

---

**3.** We note that Coleman reaches a different conclusion about the psychiatrists' testimony. We agree that their testimony is at times contra- dictory under cross-examination, but after reviewing all of the lengthy statements, we believe this is a fair reading of their conclusions.

man's rights have not been violated in any substantial way. Moreover, an appropriate penalty on Vanes' for his contempt will be a greater deterrent to others than a reversal and a second trial.

The trial court properly denied the motion for mistrial.

### III. *Identification Procedures*

■ Coleman argues that the trial court erred when it allowed A.H. to identify him at trial as the perpetrator. He bases his argument on what he calls suggestive pre-trial identification procedures.

The appropriate standard for admissibility is whether under the totality of the circumstances the identification in court was reliable even though the pre-trial procedure was suggestive. *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). Before the identification is inadmissible as a matter of law, the court must find that the procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. *Id.* at 197, 93 S.Ct. at 381, 34 L.Ed.2d at 410.

■ Coleman alleges that the suggestive procedures began on June 21, 1984, when A.H. was in the hospital recovering from the attack. First of all, on the morning of June 21 an F.B.I. agent showed A.H. six photographs. When she came to the third picture, one of Coleman, she said: "That's him." She added that the attacker was "darker." That comment bolstered A.H.'s credibility; the F.B.I. agent testified that indeed Coleman's personal appearance is darker than the photograph depicted. After A.H. identified the third photograph as that of her attacker, she tried to give the photos back to the agent. The agent asked her to keep looking through the entire array, and she did. Second, on the afternoon of the same day a reporter for the Gary *Post–Tribune* showed A.H. a single photograph of Coleman. A.H. said the photo was not of the attacker. Third, later in the afternoon a Gary police officer showed A.H. 24 photographs, including one of Coleman. After an initial review, A.H. did not identify any of the photos. The officer then encouraged A.H. to review the

photos once more. She did and identified Coleman.

On June 28, A.H. again identified Coleman after reviewing photos at the Gary police station. Finally, she identified Coleman in a lineup in Chicago and at trial.

Everyone involved in the events of June 21 testified that it was a coincidence that A.H. was shown so many photographs on that day. The actions were apparently uncoordinated. Coleman does not argue that any of these arrays were performed through suggestive techniques such as prompting. It is true that the news reporter, obviously not a state actor, showed A.H. a single photograph. Curiously, A.H. said that the photograph, though similar to the others of Coleman, was not of the attacker.

Other events buttress A.H.'s identification. On June 19, 1984, A.H. was shown a photo array that did not include Coleman, and she did not make an identification. Again on June 20, A.H. was shown a photo array that did not include Coleman, and once again she did not make an identification. These displays, along with the display by the F.B.I. agent, strongly indicate that A.H.'s pre-trial identification was not the product of improperly suggestive procedures.

Coleman's argument about the propriety of allowing A.H. to identify him in court also relies on considerations such as: 1) A.H.'s uncertainty in her initial description of the attacker to police, 2) her young age, and 3) her failure to wear her eyeglasses on the day of the attack. Her initial description was somewhat uncertain. A.H. is only ten years old but the trial court found her competent to testify. She was not wearing her eyeglasses during the attack, but the glasses were prescribed to correct nearsightedness, an impairment of vision at a distance. A.H. obviously observed her attacker at close range.

After reviewing the recorded testimony on this issue and Coleman's legal arguments about the pre-trial procedure, we conclude that the trial court properly ad-

mitted A.H.'s testimony identifying Coleman.

### IV. *Death Penalty Selection*

■ Coleman argues that Indiana's death penalty statute is unconstitutional under the eighth amendment because it grants the prosecuting attorney the power to select arbitrarily and capriciously which defendants against whom to seek the death penalty. He argues that "[i]n Indiana the only way that death can be an available sentencing alternative is for the prosecution to specifically request it in the indictment or information." For legal authority, Coleman cites a single federal district court opinion, *U.S. ex rel. Silagy v. Peters*, 713 F.Supp. 1246 (C.D.Ill.1989). That district court's holding on this issue has been reversed. *Silagy v. Peters*, 905 F.2d 986 (7th Cir.1990).

We have resolved this issue against Coleman's position. *Fleenor v. State* (1987), Ind., 514 N.E.2d 80, *cert. denied*, 488 U.S. 872, 109 S.Ct. 189, 102 L.Ed.2d 158 (1988).

### V. *Appropriateness of Sentence*

■ This Court reviews the imposition of each death sentence to determine whether the penalty is appropriate to the offender and his crime. While our review is not *de novo* in the sense that we are not in a position to assess the testimony in the same way a trial court does, this Court's determination is an independent one in that we must be satisfied ourselves that the proofs required by the statute are adequate and that the weight of the aggravators and mitigators justifies the penalty of death.

■ The State has proven the two aggravators charged. First, that Alton Coleman was earlier convicted of murders in Ohio is a matter of record in that state and in this case. Second, the evidence demonstrated that Coleman enticed two young girls into a woods, bound them, stomped and strangled one of them to death, and repeatedly molested the other—all essentially as part of one episode.

We are unable to find any matters pointing toward mitigation. The psychiatric evidence was that Coleman is mentally competent; it portrays his as a manipulative sociopath of above average intelligence. He neither played a minor part in these crimes, nor acted under the domination of another, nor with the consent of the victims. In short, there is nothing apparent to detract from his culpability. Unable to see any mitigation, we are satisfied that the aggravating circumstances justify the imposition of the death penalty.

We affirm the trial court's judgment in all matters relating to Coleman's conviction and sentence of death. We direct the trial court to enter a sentence for Vanes' contemptuous actions adequate to deter such conduct.

GIVAN and DICKSON, JJ., concur.

PIVARNIK, J., concurs in result with opinion.

DeBRULER, J., concurs in result and dissents with opinion.

PIVARNIK, Justice, concurring in result.

I concur with the majority on the merits of the issues presented for our review. However, I question the propriety of this Court directing the trial court to make a judgment as to sanctions for contempt. It peculiarly is within the jurisdiction of the trial judge to make a judgment as to what sanctions might be appropriate. If his decision might be thought to violate the law or to be an abuse of his discretion, the question can be presented to this Court in a proper appeal procedure.

Inasmuch as the issue is not before us and is before a capable and experienced trial judge, I see no grounds for this Court assuming the role of trial judge and mandating a particular ruling.

DeBRULER, Justice, concurring in result and dissenting.

I vote to affirm these convictions, set aside the sentence of death, and order new jury and judge death sentencing hearings or the imposition of a term of years for the murder conviction. The judge's sentencing order should be set aside because there is need for a specific clarification with regard

to the question of whether or not he did consider the highly irrelevant and prejudicial testimony of Mary Hillard when making the death decision. I cannot agree with the majority opinion wherein it concludes that the defendant in an Indiana capital case is not prejudiced when a judge receives such testimony at a sentencing hearing, and the judge then sentences the defendant to death, making no mention of having considered such irrelevant and highly prejudicial matter. When received by a sentencing jury, such matter creates an unacceptable risk that the jury will impose the death penalty on an arbitrary and capricious basis. *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). When an appellate court is satisfied that such matter has been received by a sentencing judge and is not satisfied that it played no role in the decision to give the death penalty, I would adopt the procedure of remanding the case to the trial judge to amend his written statements supporting the consideration of aggravating and mitigating circumstances to clarify the picture.

A remand is particularly appropriate here because the judge expressly ruled at the sentencing hearing that such testimony of Mary Hillard was not irrelevant. In the aftermath of that ruling, the absence of any mention in the judge's written findings of Mary Hillard's extreme despondency does not provide a satisfactory indication that he did not consider it.

I also find that I am unable to agree with the majority of the Court wherein it concludes that the Eighth Amendment protection against the death sentencing use of irrelevant and prejudicial victim impact information pronounced by the United States Supreme Court in *Booth* should in some manner be deemed waived for the purposes of review because of the lack of a contemporaneous objection by defense counsel to the admission of such information. Because of the special character of the death penalty, the unique problems in implementing it, and the great need to ensure its integrity, I would not employ the waiver for failure to object at all in resolving constitutional claims against the death penalty made in the first direct appeal or in any motion to correct errors immediately preceding it. Such a finding of waiver in non-death penalty areas is seldom the final resolution of the appellate claim and is most often the prologue to a low-scrutiny, truncated form of review of the appellate claim on the merits. That level of scrutiny I find intolerable when reviewing the propriety of the death penalty. If a finding of waiver is not followed by such a lesser review process, but a full-blown one instead, then I see no purpose in maintaining the waiver, as it would be no more than pretense.

The jury's recommendation of death cannot stand here because one of the two aggravating circumstances upon which it is based is non-existent. Despite the fact that appellant does not complain, the defect is apparent. The second aggravating circumstance is based upon I.C. 35–50–2–9(b)(7), which provides:

The defendant has been convicted of another murder.

Beyond the legitimate questions of what constitutes a conviction and what constitutes a murder for the purposes of the statute, is the question most pertinent here, namely, the question of when the conviction constituting the aggravating circumstance must occur in relation to the charged murder. The dominant character of all of the aggravating circumstances set forth in the statute is their close proximity in time and space to the criminal conduct constituting the charged murder. They include the state of mind of the defendant at the time of the murder, the means by which the murder is committed, the circumstances and condition of the murder victim, and the circumstances and conditions of the defendant at the time of the crime. The aggravating circumstance in I.C. 35–50–2–9(b)(7) falls in the last-mentioned category. It identifies a condition or quality of the defendant at the time of the crime, namely, that at the time of the decision to kill, the defendant had already experienced detection and arrest, had been subjected to the judicial processes including conviction for murder, and was undeterred by such experiences. It is apparent that appellant Cole-

man does not fall in this class of persons, as at the time he committed this murder, he had not yet been convicted in Ohio of the two murders alleged. Upon this error, apparent on the record, I would include in the remand order to Judge Maroc that the sentence of death be ordered, if at all, solely upon the basis of the first aggravating circumstance as identified in the majority opinion.