James Douglas BLEVINS, Jr.

v.

The STATE of Texas.

No. 09–92–273 CR.

Court of Appeals of Texas,
Beaumont.

Submitted Jan. 6, 1994.

Decided Sept. 28, 1994.

Jerald D. Crow, Darden, Fowler & Creighton, Conroe, for appellant.

Daniel C. Rice, Dist. Atty., Michael R. Davis, Asst. Dist. Atty., Conroe, for state.

Before WALKER, C.J., and BROOKSHIRE and BURGESS, JJ.

## OPINION

BROOKSHIRE, Justice.

Appellant, James Douglas Blevins, Jr., was indicted for the offense of murder. He plead not guilty and, following a trial to a jury, he was found guilty of the lesser included offense of voluntary manslaughter. The jury assessed punishment at 20 years confinement in the Institutional Division of the Texas Department of Criminal Justice and the appellant was assessed a fine of $10,000. It is from this jury verdict that appellant brings his appeal.

On May 18, 1991, at about 8:30 a.m. Detective George Mixon of the Montgomery County Sheriff's Department was dispatched to the home of James Blevins in Porter, Mont-

gomery County, Texas, to investigate the shooting death of one Paul Danny Woodard. Upon arrival he investigated the scene with four other officers and he found the deceased victim, Paul Danny Woodard, lying in a ditch across the road from the residence of the appellant, James Douglas Blevins, Jr. Pursuant to permission from the owner of the residence, who was James Douglas Blevins, father of the appellant, Deputy Mixon entered the residence and found the appellant who agreed that the deputy could search appellant's bedroom. It was in the appellant's bedroom that Deputy Mixon found a .22 caliber rifle which was later proven to have been the murder weapon. By 12:30 p.m. on May 18, 1991, appellant had given a statement in which he admitted shooting the victim. An expurgated statement and tape were admitted into evidence during the State's case-in-chief. These edited versions demonstrated unjustified murder of Woodard by Blevins. During cross-examination, appellant's counsel had the entire statement and tape admitted under the rule of optional completeness to show motive and self-defense. TEX.R.CRIM.EVID. 106. In the complete statements, and again in his testimony, appellant provided two motives for having shot the victim. He first stated that he was afraid the victim was about to stab or shoot him and secondly, that he had grown fed up with the abuse which the victim had directed toward his family and his sister Shelly, the victim's former girlfriend. Prior to having shot the victim, the appellant stated that the victim had threatened his sister from his automobile. Appellant then smashed the window out of Woodard's car with the butt of the rifle in question. The victim stopped the automobile he was driving, threatened to kill the appellant and began running towards him. The appellant fired one warning shot, then fired again at the victim and ran to his house.

Appellant brings a singular point of error alleging that appellant's conviction is void because trial counsel did not render effective assistance during either the guilt/innocence or punishment phases of the trial. Appellant points to nineteen instances of alleged misconduct on the part of appellant's trial counsel during the guilt/innocence phase and six instances of alleged misconduct on the part of appellant's trial counsel during the punishment phase of the trial.

The State produced seven witnesses before resting its main case. Denise Harmon, the victim's mother, identified a photograph of the victim and testified to basic information regarding him. On cross-examination counsel for appellant attempted to delve into the character of the victim but was prevented from doing so by the court after objections by the State. It was apparent that appellant's trial strategy would initially consist of attacking the victim's character to show his propensity for violence which in turn would substantiate a claim of self defense. *Gonzales v. State*, 838 S.W.2d 848 (Tex.App.— Houston [1st Dist.] 1992, pet. dism'd), *improvidently granted*, 864 S.W.2d 522 (Tex. Crim.App.1993).

Ed Scruggs then testified that he was friends with the victim, Paul Woodard, and had known him for about four years. The night before the shooting at about 11:00 or 12:00 o'clock the victim visited Scruggs and another friend. They drank beer and watched a movie on television until about 3:30 or 4:00 o'clock when Scruggs went to sleep on the couch. The next morning at about 6:30, the day of the incident in question, Scruggs talked to Woodard about going to Astroworld and taking their girlfriends. Woodard called Shelly Blevins, but talked to appellant calling him "Jamie". Appellant hung up on him and Woodard called back only to be disconnected again. Scruggs testified that Woodard was persuasive but not loud, angry, or unusual in any way. Woodard then left to retrieve Shelly, and return which would have taken 45 minutes to an hour. On cross-examination Scruggs said that he knew Shelly and Paul had broken up but that they had gone to a movie together one week previously. It appeared to Scruggs that Woodard had talked to Shelly on the phone. Scruggs stated that Woodard was not angry while talking to appellant.

Danny Bates testified that he lived across the street from the appellant and on the morning of May 18, 1991, he was awakened by three gun shots from a .22 caliber gun.

He heard one shot and then approximately two seconds later two more shots which were closer together. He looked out his front window and saw an automobile at the end of his driveway with the back window broken out. He also saw a body laying in the ditch directly across the street from his house, which would have been in front of the Blevins' residence. He noticed Mrs. Blevins and Shelly were rather upset. However, no emotion was shown from the appellant who was standing about four feet away from the victim.

The State then called Detective Kenny Dunlap who was employed by the Montgomery County Sheriff's Department. He was dispatched to the location in question. On arrival he observed the victim's body and he noticed Mrs. Blevins in an hysterical condition. He went inside the Blevins' house and observed the appellant with a very calm demeanor. He gave the *Miranda* warnings to the appellant and asked him where the gun was. The appellant took him to his room and showed the detective the rifle laying on the floor. Dunlap did not retrieve the rifle but instead waited for the crime scene investigator, George Mixon, to examine the scene and the gun. Detective Dunlap took a photograph of the appellant which was entered into evidence. Appellant's attorney objected to the admission of the photographs into evidence as being prejudicial because there were certain posters in the background depicting physical prowess, marijuana, and death symbols. This objection was overruled. Detective Dunlap further testified the appellant actually assisted him in showing him the weapon.

The State then called Deputy George Mixon of the Montgomery County Sheriff's Department as an expert trained in crime scene investigation. Deputy Mixon testified he obtained consent from Mr. James Blevins, Sr. to search the residence and to examine the entire crime scene. James Blevins, Jr., the appellant, also consented to the search. Deputy Mixon found broken glass from the rear section of the victim's vehicle in the driveway of the appellant's residence. Deputy Mixon also found tire marks in the center of the street consistent with acceleration away from appellant's residence by the victim and an intervening space with no tire marks and then another set of tire stripes indicating skid marks of the victim's vehicle. His testimony indicated that the victim was leaving appellant's house in a hurry, then applied his brakes hard enough to leave skid marks in the street.

Deputy Mixon also found two gun shot markings on the Mazda automobile the victim was driving. He also determined, based on locating two casings fired from the weapon used by the appellant, that they could not have been fired by an individual in the same place and position. Deputy Mixon surmised, based on the scattering of the glass, the back window was first broken in the driveway area and then scattered by the car continuing on the street.

The State then called Dr. Tom Brown, Assistant Medical Examiner for the Harris County Medical Examiner's Office. Dr. Brown testified that the cause of death of Paul Woodard was a perforating gun shot wound through the heart through the lower lobe of the left lung that exited from the back. Dr. Brown also testified that toxicology results on Paul Woodard revealed a blood alcohol level of .112 percent, cerebral spinal fluid alcohol level at .119 percent, .01 milligrams per decaliter percent of cocaine in his blood stream, and .03 milligrams per decaliter of diazepam also known as valium, and a trace of nicotine.

Detective Tracy Peterson who was called by the State was examined out of the hearing of the court by appellant's attorney to determine the voluntariness of a statement and confession given by the appellant to the authorities. At the end of an extensive examination, appellant's attorney lodged numerous objections to the admission of the confession. The court complied with several objections but admitted the confession in part. The statement by the appellant confirmed that he had shot at the victim in his driveway, that he had lived with the victim, and that the victim had dated his sister, Shelly. He stated in the confession that the victim said he was coming to the appellant's house, so appellant went into his yard with his gun to wait for the victim, thinking that the victim

would not be stupid enough to jump out and start any trouble with appellant. Blevins stated that Woodard pulled into the driveway and saw the gun. As Woodard began to back out, Blevins smashed the back window of the automobile. The victim then got out of the car and appellant shot him. Appellant then ran to the house and looked back seeing that the victim was laying in the ditch. Later, appellant turned the rifle with which he had shot the victim over to Deputy Dunlap.

Subsequent to the admission of the abridged statement by the State, the defense offered a taped version of the entire statement by the appellant. Trial counsel's purpose for doing so placed the issue of self defense before the jury through the unexpurgated tape. Appellant testified on the unedited tape recording that the victim had been calling the Blevins' house threatening to kill the appellant. He stated that the victim hated him though Blevins did not know why. Appellant stated he had never done anything to the victim but that Woodard stated he was going to kill him, his sister, and in fact his entire family. These threats were made early on May 18, the day of the offense. He stated that Woodard had been threatening the family for a long time and in fact he threatened to kill the entire family that morning. He further stated that Woodard pulled into the driveway and appellant talked to him for a second but appellant noticed that the victim looked "wasted" so he told Woodard that he was tired of the harassment. The victim backed out of the driveway yelling something about killing the family, and appellant took the gun he was carrying and smashed the back window. Woodard rolled forward a little bit, jumped out of the car and started running at the appellant and the appellant shot him. Appellant further stated on the tape that Woodard was threatening to kill him and appellant thought Woodard might have a knife or gun in his back pocket. It appeared to appellant that Woodard could have had something behind him towards his back pocket. He further stated that he did not mean to hit him when he shot at him and he did not want to kill him. He was asked on the tape if he had ever been in trouble before, ever been in jail, or arrested. Appellant denied all three questions. Blevins stat-

ed that Woodard had been in jail but he did not know why. He further stated that his sister, Shelly, had split up with Woodard two years previously, that the family had their phone number changed to avoid the harassing telephone calls from Woodard but the number had been changed back to the original phone number about three months prior to the incident in question. The State then rested their case-in-chief.

At this point, the State had presented a solid case which, if unrebutted, could have easily supported a conviction of murder against the appellant as alleged in the indictment.

We can also see that at this point the appellant had opened the door to extraneous offenses because of his denial contained in his confession of ever having been in trouble. Tendering the complete taped confession into evidence is supported by trial strategy because the State had introduced an edited version of the confession which contained no exculpatory statements at all. Under the rule of optional completeness, Tex.R.Crim. Evid. 106, the appellant had to introduce the entire statement to gain any favorable statements contained in the confession. This was a trade-off in view of the fact that in the confession, the appellant stated that he had never been arrested, never been in jail, nor had he ever been in trouble previously. While this opened the door to evidence which would impeach the appellant making these statements, other portions of the confession which the State did not admit described the appellant as acting in self defense.

In the confession, the appellant described the victim as a violent person who had spoken and exhibited numerous threats toward the appellant, his sister, and his entire family. He also stated that he did not want to kill the victim, but the victim had run toward the appellant in a threatening manner, in a way that indicated the victim might have a gun or knife in his back pocket, therefore, appellant shot the victim in self defense.

Appellant's case started with his mother, father, and their attorney testifying that there had been a consultation concerning ha-

rassing phone calls made to their residence, presumably by the victim.

Kirk Ervin, a deputy sheriff of Montgomery County, Texas, then testified that he had heard of the victim being involved in other shootings and that Woodard had a reputation for violence and getting into fights.

Shelly Blevins, appellant's sister, testified that she had not talked to the victim, Woodard, on the morning of May 18, 1991, nor did she plan to go anywhere with the victim that day. Her girlfriend, Stephanie Bush, verified Shelly's testimony by stating they had planned to spend the day together. Shelly also testified she witnessed the victim commit various acts of violence. She testified he had run her off the road with his automobile at one time, and that she had witnessed him threatening others.

Jodie Garrett testified for the appellant that she had witnessed the victim harassing Shelly and he had harassed the witness by calling at late hours every 15 minutes three and four times a week while Shelly was staying with the witness. These calls occurred for approximately six months. Ms. Garrett also testified that she knew of two specific instances in which Blevins had gone out of his way to avoid any contact with Woodard.

Elizabeth Denman had been friends with the victim and with the appellant. She had never heard the appellant threaten the victim but she had heard Woodard threaten Blevins physically. She also testified that she was with the appellant and Brian Fury on May 17, 1991, and the three of them had visited at Fury's hotel room until about 6:00 o'clock in the morning of May 18, 1991. They took appellant back to his father's house at about 7:00 o'clock that morning.

The appellant called Mike Gilcrease who testified the victim had offered one ounce of cocaine to the witness if he would give him the Blevins phone number. This occurred the morning before the shooting. Mr. Gilcrease also testified he knew that Woodard was hassling the Blevins family. He also testified that he had seen the victim lose his temper with his mother and had screamed and cursed at her.

Steve Hammel then testified that while he was intoxicated and asleep on the floor of the victim's apartment, Woodard kicked him in the ribs about four times requiring medical attention at the Humble Hospital. He also knew that Woodard had a .25 caliber automatic pistol because he had seen him shooting it.

Bobby Ainsworth then testified that he had known Shelly Blevins since elementary school and on one particular occasion in early 1991, Shelly had left a party at his house with a girlfriend and had returned driving real fast. She and her girlfriend were very scared and an automobile driven by the victim was following them at a high rate of speed. They both stopped at the Ainsworth house and they all got out of their automobiles. Woodard was told to leave but he refused to do so. Another man actually struck Woodard and forced him to leave the premises.

Richard Cole testified that his girlfriend was Shelly Blevins and had been so for approximately two and a half years. He had been living in Florida approximately four months prior to the shooting incident but prior to moving to Florida he had an altercation with the victim, Paul Woodard. Another person intervened, got into a fight with Woodard and knocked him out.

Robin Armstrong testified that she knew the appellant and the victim, and was aware of a conflict between the two. She testified that at least on one occasion the appellant avoided contact with the victim by refusing to go into a house because Woodard was inside. She also testified that the victim had laughed about having beaten Steve Hammel. She also testified that she had done drugs with Paul Woodard in the spring of 1991 about three weeks before Woodard was killed.

Blevins then testified about having lived with the victim while his sister was also living with Woodard. He described how Steve Hammel had been injured by Woodard while they were in the apartment. He also testified that after Shelly and the victim broke up, Woodard constantly called the house and harassed the family. He recognized Woodard's voice on the answering ma-

chine for the telephone, leaving a message containing threats and cursing. Appellant testified that on the morning of May 18, 1991, Woodard called several times mumbling and threatening to do physical violence to the appellant. The last time Woodard called, Blevins said it was from a convenience store nearby. Appellant testified further that he was afraid about the victim coming to his house knowing that Woodard was highly intoxicated on something and he had threatened the family. Appellant stated that Woodard pulled into the driveway and the appellant walked directly to the victim's car and told him that he should leave. The victim then uttered threats against Shelly saying that he was going to get her before she left. He stated this as he was backing out and starting to drive forward. The appellant became very angry and upset. He smashed out the back window of the victim's automobile by using the butt of his rifle. Woodard then hit his brakes and jumped out saying that he was going to kill Blevins and began running towards him. The appellant testified that he fired one warning shot and then about two seconds later he shot at the victim. Blevins stated that he could not see Woodard's hands and was afraid he might have a gun because Blevins knew Woodard owned a Raven .25 automatic pistol. Blevins also knew that Woodard carried a knife that had a pair of brass knuckles made on to it. The appellant then ran to his house, turned around and saw the victim laying in the ditch. He then went into the house, woke his sister up and told her to call 911. Blevins testified to being very upset when he hit the glass in the automobile. He felt like Woodard would have come back and continued harassing or even hurt his sister Shelly. Blevins stated he was very afraid when he saw Woodard coming at him.

On cross-examination, appellant testified that even though he had stayed up all night in a motel room with Betsy Denman and Brian Fury, that he had not done any drugs, smoked any crack cocaine, smoked any marijuana, nor taken any valium that night or early the next morning. He denied hanging up on Woodard the first time he called. He also denied Woodard was coming over to offer a peace offering. Blevins testified he bashed out the window in anger. Appellant further testified the victim was running at him, actually charging him when he shot the victim although he did not intend to kill Woodard. Although the victim had driven by the Blevins' house on several occasions previous to May 18, appellant had never gotten his gun out. He denied ever telling Brian Fury that Woodard was coming to offer a peace offering, to let water go under the bridge, and to bury the hatchet.

There was then a conference at the bench out of the hearing of the jury in which the district attorney informed the appellant's attorney and the court that he intended to bring witnesses forth who had seen appellant shooting at cars previously, that Blevins had been seen drunk on certain occasions and threatening people. He argued that this evidence went to the issue of self defense. The court ruled in his favor at that time.

The State's attorney then inquired of the appellant about an incident approximately one year prior to the murder in which appellant had gotten into an argument with a girl and her mother and that he had shot at them in their automobile with his rifle as they drove off. Appellant denied that as being true.

He further denied that he had pulled a pistol and threatened to hurt somebody until Mitch Feist had stopped him at his apartment. Blevins further denied having hung out a window of an automobile with a pistol and fired at another vehicle and that Tracy Carry had been with him at that time.

He admitted having bashed the rear window and front window out of the car belonging to a former girlfriend, Carol Robinson, although he denied making certain phone calls to her. He further admitted that he was convicted of the damage done to her automobile on that occasion. The State passed the witness and at this point, the appellant rested his case.

On rebuttal, the State called Brian Fury who testified that on the night of May 17, 1991, and the early morning hours of May 18, he and appellant had done crack cocaine and marijuana. Fury further testified that Blevins talked to him after getting out of jail for

the homicide in question, and the appellant had told him that Woodard was coming to his house after having hung up a couple of times. Fury testified appellant said the victim had called and said he wanted "water underneath the bridge" indicating a cessation of hostilities between the two, but the appellant wanted nothing to do with the victim. Even though the victim said he was going to appellant's house to make peace and "let water be under the bridge", Blevins told Woodard not to come. Appellant had specifically denied all these events on cross-examination by the State.

The State then recalled Ed Scruggs who remembered from the phone calls that Woodard made from Scruggs' apartment on May 18 that Woodard tried to talk appellant into allowing him to speak with Shelly and there was mention of a peace offering. Later he believed that Woodard was talking to Shelly because Scruggs heard the word "Baby". It was his impression that Woodard had been talking to Shelly that morning by the things Woodard said. Scruggs also testified that he knew the victim's reputation for being a peaceable citizen was good. Scruggs also testified he did not know anything about Shelly living in Florida nor how long she had been there because his information was based on what the victim had told him. He stated Woodard had told him he, Woodard, thought he and Shelly were getting back together because they had been to a movie the previous week.

Keith Hedges then testified for the State that he knew the victim's reputation in the community as a peaceful citizen to be good. He further testified that he had personally seen the appellant carry a pistol on him and keep a rifle in his apartment. He was not aware of Woodard owning a pistol.

Donnie White, a patrolman with the Houston Police Department, who lived on the same street as the appellant, testified he was familiar with the appellant's reputation in the community for being a peaceful and law abiding citizen and it was bad. He stated this even though he had never met Blevins personally nor had he ever been to his house. He only knew him by his reputation.

Danny Bates was recalled as a witness for the State and he testified that following the shooting incident, the emotional condition of the appellant was very solemn and uncaring. Bates testified that appellant showed no emotion at all. His wife, Debra Bates, testified she saw appellant after the shooting, that he was calm, and he was smoking a cigarette while standing near the body of the victim. She also testified that she knew his reputation as a peaceful, law abiding citizen to be bad.

Tracy Carry was called by the State and testified that appellant's reputation as a peaceful and law abiding citizen was bad. He also testified that he had seen the appellant hang a weapon out of the window of an automobile and shoot at someone in another car. Carry and his friend, Jerry Allen Harvey, got rid of Blevins by dropping him off at his house because they did not want anything to do with him. That incident took place in 1985. In 1989, Carry saw the appellant with a gun at a party and when police came to the house, Blevins hid the weapon between the mattresses in the back bedroom.

Howard Rushing, who lived across the street from the Blevins' house was called by the State. He testified that after the shooting he noticed the appellant acting in a normal manner. Appellant was not upset or angry but appeared to be calm and he was smoking a cigarette. Mr. Rushing also testified that approximately one year previous to the shooting he noticed a lady and a girl, the appellant and another young man having an altercation at the Blevins' residence. He saw blows being exchanged between the older lady and the girl. The woman put the girl in her car and drove off. The appellant appeared to be exchanging words with the older lady and when the woman started to drive off, appellant went into his house and came back with a rifle, pointed it in the direction of the car and fired. He also testified that the reputation of the appellant for being a peaceful and law abiding citizen was bad. The State called Mr. Rushing's wife, Lawana Rushing, who verified all of her husband's testimony almost word for word.

Deputy George Mixon was then recalled by the State who testified that he did not

find any drugs in the victim's automobile nor anywhere in the area. He further testified that he did not find any weapons on the body of the victim. The State then closed its rebuttal case.

The appellant on rebuttal first recalled the mother of the appellant, Elizabeth Blevins. She testified that appellant was upset following the shooting but he is not the person to outwardly show his emotions. She testified that he was very solemn but he was very shaken. His voice was shaking, and even his body was shaking. She testified that to her, he appeared very upset.

The appellant then called Rosemary Casares whose backyard adjoined the Blevins' property. She testified she had never had any problems with the appellant and his reputation for being a peaceful and law abiding citizen was not a bad one that she knew of. The district attorney on cross-examination asked Ms. Casares if she had heard about the appellant shooting at a mother and daughter driving from his house. She had not. Then he asked if she had heard about the appellant shooting from a car at someone else in 1985 and she had not. He also asked her if she had heard that appellant was at a party with a gun and when some police came, he hid the weapon from the police. She had not.

The appellant then called Wanda Roberts who testified she understood the appellant to have a fine reputation and when asked if his reputation was good or bad, she replied that it is very good and she had known him for 17 years and had never heard anything bad about him. The district attorney on cross-examination asked Ms. Roberts if she knew about Jamie Blevins shooting at a mother and daughter who had driven away from his house, to which she replied she had not. He then asked if she knew that in 1985 he had hung out a car window and shot at someone else, to which she replied she had not. He asked if she knew that at another time in 1989, while at a party at someone's house, he had hidden a weapon from the police in a bedroom. She replied she had not and that she was not aware of that incident. She was aware of an assault report being filed against the appellant by Shelly Blevins October 19,

1990, but she ascribed that to a brother and sister dispute. She was also slightly aware of the appellant having been convicted of destroying the front and back window of an ex-girlfriend's car in Kingwood in 1990.

Jayne King was then called by the appellant who testified that she knew of the appellant's reputation for being a peaceful and law abiding citizen and that his reputation was good. On cross-examination, the district attorney asked the witness essentially the same questions as he had asked Ms. Roberts and received negative answers thereto.

Marta Henna was called by the defense and essentially the same testimony was elicited by the appellant as that of Ms. King. The cross-examination was essentially the same by the State, and the answers were in the negative. Both sides then closed their cases and rested.

Appellant brings one point of error before the Court alleging appellant's conviction to be void because trial counsel did not render effective assistance during the guilt/innocence nor punishment phases of the trial. Appellant cites nineteen instances of conduct during the guilt phase and an additional six items during the punishment phase of the trial to support his allegation of ineffectiveness on the part of the trial counsel.

At the outset, we recognize that the standard for reviewing counsel's effectiveness at trial during the guilt/innocence phase consists of two requirements, (1) that counsel's performance was deficient and that (2) counsel's deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). To prove prejudice, the appellant must show that a reasonable probability exists that, except for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is that probability which is sufficient to undermine confidence in the outcome which was reached. *Id.* 466 U.S. at 694, 104 S.Ct. at 2068, 80 L.Ed.2d at 678. Under the *Strickland* test, the trial court defendant bears the burden of proving ineffective assistance of counsel. *Jackson v. State*, 877 S.W.2d 768 (Tex.Crim.App.1994). Without

both findings the Court will not be able to conclude that the conviction resulted from a breakdown in the adversarial process that rendered the result unreliable. *Boyd v. State*, 811 S.W.2d 105 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 112 S.Ct. 448, 116 L.Ed.2d 466 (1991). The standard set by *Strickland* has been adopted in Texas by *Hernandez v. State*, 726 S.W.2d 53 (Tex. Crim.App.1986). Contentions of ineffectiveness must be proved by the accused by a preponderance of the evidence. *Ex parte Kunkle*, 852 S.W.2d 499 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 122, 126 L.Ed.2d 87 (1993). Even assuming errors on the part of trial counsel for appellant, such errors are not to be examined as isolated incidents but in the context of the overall record. *Bridge v. State*, 726 S.W.2d 558 (Tex.Crim.App.1986). *See generally, Ex parte Menchaca*, 854 S.W.2d 128 (Tex.Crim. App.1993); *Muniz v. State*, 851 S.W.2d 238 (Tex.Crim.App.), *cert. denied*, —— U.S. ——, 114 S.Ct. 116, 126 L.Ed.2d 82 (1993). We must indulge a strong presumption that counsel's conduct in the trial court falls within the wide range of reasonable professional assistance and appellant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065, 80 L.Ed.2d at 694; *Jackson*, 877 S.W.2d at 771. A full inquiry into the strategy of counsel should only be made if, from all appearances at trial, there is no plausible, tactical basis for counsel's actions. *Ex parte Burns*, 601 S.W.2d 370 (Tex.Crim.App.1980). In determining effectiveness of counsel, gauging the totality of the effort expended by trial counsel is required. *Hernandez v. State*, 726 S.W.2d 53 (Tex.Crim.App.1986). Effective assistance of counsel does not anticipate errorless counsel nor is he to be judged by hindsight, *Ex parte Cruz*, 739 S.W.2d 53 (Tex.Crim.App.1987). Trial counsel will be allowed to make decisions regarding lines of defense and regarding strategy. *Ex parte Allridge*, 820 S.W.2d 152 (Tex.Crim.App.1991) and *Ex parte Adams*, 701 S.W.2d 257 (Tex.Crim.App.1985).

■ Initially, appellant argues that trial counsel did not require the State to provide notice of the intent to use evidence of other crimes, wrongs, or acts by the appellant. Appellant can cite no cases which address this specific point. We find that trial counsel filed a motion in limine on this point and counsel for the State approached the bench before going into these matters. The trial court expressly allowed this line of questioning by the State. This also addresses appellant's sub-point two which alleges trial counsel did not request a hearing out of the presence of the jury to test evidence. Trial counsel's strategy in asserting self defense necessarily placed appellant's character at issue. Defense had to know that these offenses would come into evidence. In any event, the notice requirement does not apply to rebuttal evidence. *Yohey v. State*, 801 S.W.2d 232 (Tex.App.—San Antonio 1990, pet. ref'd). The State in this case, had the right to present any rebuttal evidence that tends to refute the theory of self defense being urged by appellant. *Id.* at 236. That rebuttal evidence may include extraneous offenses or acts by the appellant and still be admissible. *Id.* We therefore overrule sub-points one and two.

■ Appellant then groups sub-points three through fourteen inclusive in alleging error on the part of trial counsel in failing to make objections to the State's questions directed toward the appellant and other witnesses regarding criminal acts committed by the appellant prior to the offense for which he was being tried.

All of appellant's confession was tendered to the court by trial counsel in an effort to get exculpatory statements before the jury. The prosecution had entered all the damaging portions of the confession previously. In the confession, he stated he had never been arrested, never been in jail, nor had ever been in any trouble previously. This necessarily opened the door to the prosecution to show otherwise.

■ On direct examination, appellant attempted to portray himself as never being armed with a deadly weapon whereas the victim was. It was allowable to portray himself as peaceable and even law-abiding, to show that it was unlikely he committed the offense for which he was being tried. *Mon-*

*crief v. State,* 707 S.W.2d 630 (Tex.Crim.App. 1986). However, in tendering evidence of his good character, he placed his reputation in issue. *Rutledge v. State,* 749 S.W.2d 50 (Tex. Crim.App.1988). He also opened the door to impeachment of the appellant by controverting evidence of conduct which he denied. *Davenport v. State,* 807 S.W.2d 635 (Tex. App.—Houston [14th Dist.] 1991, no pet.). After appellant testified, he was cross-examined concerning his having shot a pistol at an automobile which appellant denied. Appellant's sub-points three, twelve, and thirteen allege error on the part of trial counsel in failing to lodge objections to the State questioning appellant concerning his have shot at an automobile occupied by a mother and her daughter about one year prior to the shooting of Woodard. The shooting incident was admissible, for impeachment, rebuttal and under TEX.R.CRIM.EVID. 404(b) for the purpose of proving preparation, plan, and absence of mistake in the shooting of the victim in the case before us. It cannot be ineffective assistance of counsel to omit making an objection to questions which do not call for an objection. *Jackson v. State,* 846 S.W.2d 411 (Tex.App.—Houston [14th Dist.] 1992, no pet.); *Gonzales v. State,* 732 S.W.2d 67 (Tex. App.—Houston [1st Dist.] 1987, no pet.). Appellant's sub-points three, twelve, and thirteen are overruled.

■ The remaining sub-points four through eleven and fourteen are also directed toward alleged error by trial counsel in failing to object to questioning by the State regarding certain conduct of the appellant. The specific acts which the State delved into included; 1) appellant's threats to hurt someone with a pistol, 2) appellant hanging out an automobile window and shooting at another vehicle, 3) appellant having broken the windows out of his ex-girlfriend's car, 4) appellant's harassment of his ex-girlfriend over the telephone, 5) appellant's conviction for criminal mischief in damaging his ex-girlfriend's car, 6) appellant's having carried a pistol and kept a rifle, 7) appellant's having secreted a weapon from the police, and 8) appellant having contributed to the delinquency of a minor supposedly by allowing the daughter mentioned previously to visit his home while being truant from school. The

State was entitled to attack the image appellant was attempting to project as a truthful, peaceable person acting under a sudden and sufficient cause to defend himself from imminent aggression threatened against him by Woodard, the victim. *Delk v. State,* 855 S.W.2d 700 (Tex.Crim.App.), *cert. denied,* —— U.S. ——, 114 S.Ct. 481, 126 L.Ed.2d 432 (1993). An exception arises to the rule that extraneous offenses are inadmissible for impeachment purposes when the witness leaves a false impression with the jury about not having had any prior trouble with the law. *Nelson v. State,* 503 S.W.2d 543 (Tex.Crim. App.1974). The appellant opened the door to impeachment by the State by stating that he had never been arrested, nor had ever been in any trouble. *Hammett v. State,* 713 S.W.2d 102 (Tex.Crim.App.1986); *Davenport,* 807 S.W.2d at 637. We find that the State inquired legitimately into those prior criminal acts committed by the appellant and inconsistencies in his testimony and statements. We therefore overrule sub-points of error four through eleven and fourteen.

■ In sub-points fifteen through eighteen, twenty-two and twenty-three the appellant alleges trial counsel was ineffective because there were no objections lodged to certain questions by the State addressed to the witnesses which appellant had called in support of his reputation and character. The State asked questions in the form of "Have you heard...." and "Did you know...." The State was entitled to cross-examine the witness regarding his basis of knowledge. The appellant was trying to establish that he was a peaceful person who was law abiding at all material times. It is fundamental that reputation witnesses may be impeached with "have you heard" questions whereas opinion witnesses may be impeached with "did you know" questions. *Hedicke v. State,* 779 S.W.2d 837 (Tex.Crim.App.1989), *cert. denied,* 493 U.S. 1044, 110 S.Ct. 840, 107 L.Ed.2d 836 (1990); *Thomas v. State,* 759 S.W.2d 449 (Tex.App.—Houston [14th Dist.] 1988, pet. ref'd). Sub-points fifteen through eighteen, twenty-two and twenty-three, are therefore overruled.

Sub-point nineteen argues that trial counsel was ineffective because he did not request a limiting instruction to be included in the charge regarding the extraneous offense evidence offered by the State and admitted into evidence by the court. Appellant directs us to no authority addressing the issue of the necessity of a limiting instruction regarding the use of extraneous offenses to rebut the theory and evidence of self defense. Nor are we shown authority for the need of limiting instructions regarding the use of impeachment evidence tendered by the State and admitted into evidence by the Court. Further, appellant does not tell us the purpose of the instruction, the need for it, nor what the contents should be. *Vuong v. State,* 830 S.W.2d 929 (Tex.Crim.App.), *cert. denied,* — U.S. —, 113 S.Ct. 595, 121 L.Ed.2d 533 (1992). Sub-point of error number nineteen is overruled.

After reviewing sub-points one through nineteen, we cannot say that trial counsel's performance was deficient. The evidence presented by the State was more than sufficient to sustain a verdict of guilt. Trial strategy dictated that appellant's trial counsel go forward with evidence which would justify appellant's actions. In doing so, the character of the appellant was placed in issue together with prior inconsistent statements and admissions against interest made by the appellant, not only in his confession to the authorities but in his testimony at trial.

In viewing the overwhelming evidence against the appellant and the ease with which the State could prove the guilt of the appellant, trial counsel was severely limited in providing any kind of defense for the appellant. There was no element of the crime which the State could not easily prove. Trial counsel's strategy in asserting a self-defense theory and proving that the crime committed was a lesser included offense within the crime that had been charged necessarily required placing the appellant on the witness stand. *See Hathorn v. State,* 848 S.W.2d 101 (Tex.Crim.App.1992), *cert. denied,* — U.S. —, 113 S.Ct. 3062, 125 L.Ed.2d 744 (1993); *Royster v. State,* 622 S.W.2d 442 (Tex.Crim. App.1981). The strategy was obviously successful because the jury convicted the appellant of the lesser included offense of voluntary manslaughter rather than murder for which he had been indicted.

Appellant's sub-points twenty through twenty-six inclusive address conduct of appellant's trial counsel during the punishment phase of the trial. Sub-point twenty repeats the claim of sub-point nineteen alleging ineffectiveness because trial counsel did not ask for limiting instructions to be included in the court's charge regarding the extraneous offenses and bad acts. Again, appellant does not direct this Court to any authority addressing the issue of the necessity of a limiting instruction during the punishment phase of the trial where extraneous offenses are offered to "impeach the character" of the appellant. Again we are not advised what the instruction should be, and accordingly we overrule said point. *Vuong,* 830 S.W.2d at 940.

Sub-points twenty-one and twenty-four are directed to the evidence tendered by appellant for being a peaceful and law abiding person even though trial counsel had notice of the extraneous offenses and bad acts that would be used to impeach appellant's character witnesses. Appellant also alleges error in sub-point twenty-four that trial counsel should not have placed appellant on the witness stand and questioned him concerning his past use of marijuana, LSD, and cocaine. Appellant argues that it could not be trial strategy nor does appellant cite us to any authorities to sustain his point. We disagree with appellant. When a claim of ineffective assistance of trial counsel is reviewed by this Court, we must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable, professional assistance and appellant must overcome the presumption that the challenged conduct can be considered sound trial strategy. *Jackson v. State,* 877 S.W.2d 768 (Tex.Crim.App.1994).

In placing appellant on the stand and questioning him concerning his past use of certain drugs, trial counsel could have been demonstrating honesty and forthrightness to the jury to substantiate a plea for probation. *See Qualls v. State,* 825 S.W.2d 240 (Tex.App.—Fort Worth 1992, no pet.).

Sub-points twenty-one and twenty-four are therefore, overruled.

Sub-points twenty-two and twenty-three have previously been overruled in our disposition of sub-points fifteen through eighteen.

 Sub-point twenty-five is directed toward trial counsel failing to object to the testimony of the mother of the victim in giving an impact statement and tendering into evidence a poem which she had written to her son at Christmas in 1991 following her son's death. The record, in fact, shows that trial counsel objected to the admission of the poem but was overruled by the court. The victim or a close relative of a deceased is given the right to give unrecorded impact testimony to the court following assessment of punishment and after sentencing of the accused. TEX.CODE CRIM.PROC. art. 42.03 § 1.

On the other hand, it has been held the State may call witnesses to give victim impact testimony so the jury may consider the full extent of the damage done. *Miller—El v. State,* 782 S.W.2d 892 (Tex.Crim.App. 1990). This type testimony has also been given approval by the United States Supreme Court in *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991) overruling the cases of *Booth v. Maryland,* 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987) and *South Carolina v. Gathers,* 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989). We, therefore, overrule sub-point twenty-five.

*Ex parte Duffy,* 607 S.W.2d 507 (Tex.Crim. App.1980) has set the standard by which we examine trial counsel's effectiveness during the punishment phase of the trial in a non-capital case. We must examine first whether counsel was reasonably likely to render effective assistance and secondly, whether counsel reasonably rendered effective assistance. *See Craig v. State,* 825 S.W.2d 128 (Tex. Crim.App.1992). We answer both questions in the affirmative, we overrule points of error nineteen through twenty-five by finding that trial counsel was reasonably likely to render effective assistance and in fact rendered effective assistance during the punishment phase of the trial. *Ex parte Felton,* 815 S.W.2d 733 (Tex.Crim.App.1991).

The conviction of appellant is affirmed.

AFFIRMED.