HAMILTON, Senior Circuit Judge,
concurring in part and dissenting in part:
I agree with the court that the state’s failure to notify Shawn Paul Humphries (Humphries) of its intended use of victim-impact evidence during the sentencing phase of the trial did not violate Hum-phries’s right to a fair trial under the Due Process Clause of the Fourteenth Amendment. I also agree with the court’s conclusion that Humphries’s sentence was not imposed, at least in part, on the basis of information he had no opportunity to deny or explain in violation of Gardner v. Florida, 430 U.S. 349, 97 S.Ct. 1197, 51 L.Ed.2d 393 (1977). Accordingly, I concur in Part IV of the court’s opinion. However, because I cannot agree with the majority’s conclusion that the South Carolina Supreme Court unreasonably applied Payne v. Tennessee, 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), in rejecting Humphries’s claim that he received constitutionally ineffective assistance of counsel when his counsel failed to object to a portion of the solicitor’s closing argument, I respectfully dissent from the majority’s decision granting the writ of habeas corpus solely for the purpose of resentencing Humphries.
I
Before I begin my analysis, it is helpful to set forth the background facts surrounding the Payne issue. During the sentencing phase of the trial, the solicitor proffered, and the state trial court admitted, all of the evidence that was admitted during the guilt phase of the trial. Fol *279 lowing the court’s admission of this evidence, the solicitor called two witnesses from Dickie Smith’s family, his brother Randy Smith and his wife Pat Smith. These witnesses testified about Dickie Smith’s childhood, upbringing, work ethic, generosity, and close relationship with his young daughter Ashley.
Randy Smith testified that he and Dick-ie Smith grew up in a poor family and they did not have hot water. When Dickie Smith was nine-years old, his father died. After his father’s death, Smith and the other family members began working to support the family. Randy Smith testified that when Dickie Smith was in the ninth grade, he took a job as a meat cutter at Bi-Lo after school, working until 10:00 or 11:00 p.m. at night. In the tenth grade, Dickie Smith acquired a full-time job working second shift in a textile mill while continuing to attend school. Randy Smith testified everyone in the community liked Dickie Smith and he was a good person.
During her testimony, Pat Smith described Dickie Smith as ambitious, hardworking, and generous. For instance, after receiving one technical degree and becoming a supervisor, Dickie Smith went back to school to get his residential home builder’s license and began building houses in 1986. Ashley was born in 1988. Pat Smith described Dickie Smith and Ashley’s relationship as very close and testified that Ashley was having a hard time since her father was killed and was receiving counseling.
Following this testimony, the state moved to admit a photograph of the crime scene and documentary evidence demonstrating that Humphries was adjudicated as delinquent in 1985 for two breaking and enterings, convicted in 1989 in Anderson County, South Carolina of burglary and larceny, and convicted of larceny in Alabama in 1990.
In terms of making a case in mitigation, Humphries’s strategy was four-fold. First, he sought to establish that there was no intent to kill by demonstrating that: (1) he pulled the trigger after he panicked in reaction to Dickie Smith’s attempt to reach under the counter; (2) he did not kill Donna Brashier who was also in the store during the shooting; (3) he drove off without Eddie Blackwell; and (4) he voluntarily confessed to the killing. Next, Hum-phries sought to demonstrate that he was a nonviolent person who had no significant history of engaging in violent acts. He also sought to show that he was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, Humphries sought to show that he was a trust-worthy, respectful, and pleasant person.
In support of this strategy, Humphries called thirteen witnesses. The first witness was Albert Humphries, Humphries’s paternal grandfather. He testified that Humphries and his brother, Richard Hum-phries, lived with him and Humphries’s grandmother from the time Humphries was three-years old until Humphries was twelve-years old. Albert Humphries testified that he and his wife were heavy drinkers and that his wife grew marijuana in their backyard. Albert Humphries described his son, Humphries’s father, as unpredictably violent, noting that he had been to prison several times. Albert Humphries testified that his son had cut him on the arm with a knife and had kicked Humphries’s grandmother in the face, knocking her false teeth out.
Patricia Goode, Humphries’s aunt, testified that Humphries’s father had said on numerous occasions that he never loved his children and that the children should have been aborted.
*280 Humphries’s mother, Carla Scott (Scott), testified that, after she left Hum-phries’s father, she became pregnant with Humphries as a result of his father raping her at knife point. She stated that she eventually left the children with their paternal grandparents and married several more men. She reunited with the children only after she married someone who would allow the children to live with her. Scott also discussed Humphries’s criminal record. According to Scott, Humphries was arrested in 1984 for two counts of breaking and entering and was placed on probation. Thereafter, he was given more probation after he was suspended from school for fighting several times. After Humphries’s second probation revocation when he was fifteen years old, he was sent to a state facility in Columbia for thirty days and was placed on probation again. Hum-phries was arrested in January 1989 for breaking into a church, apparently looking for food because he had been living on the street for a week. Humphries pled guilty to that charge and was placed on probation. In 1990, Humphries was charged in Alabama with stealing an automobile. As a result of that charge, Humphries was sentenced to two years’ imprisonment followed by four years of probation.
Debbie Humphries, Humphries’s stepmother, testified that Humphries’s father used a combination of alcohol, drugs, and paint fumes every day and had shared those substances with Humphries from 1983 to 1992. Richard Humphries, Hum-phries’s brother, testified regarding the circumstances in which he and Humphries grew up, including: (1) their father’s violence toward his own parents; (2) the lack of hot water and sometimes running water; (3) the lack of food; and (4) the trips taken to the dumpsters to find school clothes.[1]
Preston Taylor testified that, when he was employed by the Department of Youth Services, he had numerous contacts with Humphries, who was thirteen at the time. According to Preston Taylor, Humphries was a pleasant, respectful, cooperative, and nonviolent boy.
Mary Shults (Shults), an expert witness with a degree in sociology and a master’s degree in social work, testified regarding Humphries’s social history. She related that Humphries had been reminded throughout his life that he was a product of rape. Shults stated that Humphries’s father was incredibly violent, would kick people in the face, cut people, and would refer to himself as Satan. In addition, Shults testified Humphries’s father introduced Humphries to drugs and alcohol sometime between the ages of six and ten.
Humphries’s case in mitigation was closed with the testimony of three witness, two family friends (Tammy Compton and David Shaw) and his step-sister, Jamie Scott. Tammy Compton testified she trusted Humphries enough to leave her children with him and David Shaw testified Humphries was a good, nonviolent person. Jamie Scott testified she loved her stepbrother a lot and wanted to see the jury return a life sentence.
Before the state trial court gave the jury its final instructions, the solicitor and counsel for Humphries gave their closing arguments. In his closing argument, the solicitor broke his argument down into four parts, commenting to the jury that
[y]ou look at four things in deciding the issue of punishment. You look at the aggravation. Is it an aggravated mur *281 der? You look at the character of the Defendant. You look at any mitigation, statutory mitigation or other mitigation they’ve presented to you. And the last thing you look at is the victim, his uniqueness. What harm to the community and to the victim and to the family did this Defendant cause? Those are the four things you look at.
The solicitor then turned his attention to the evidence in aggravation. The solicitor argued that the evidence in this case clearly established the statutory aggravating circumstance relied upon by the state, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon. Then, the solicitor turned to Humphries’s character and summarized Humphries’s checkered past in great detail, stating:
He’s been in trouble since he was 13 years old. When he was 13 years old, he committed two breaking and enter-ings, and he was given probation. He was given a chance by the Family Court judge at age 13.
He missed school. He got in fights at school. He got suspended at school. He ran away. And so they brought him back in at age 14 on a probation revocation, and he was given yet another chance, stricter conditions. And again, he skipped school. He ran away. He was disruptive in school. He got suspended.
So at age 15 he’s brought back in for another probation revocation. And this time the Family Court Judge said, “You know, enough is enough. We’re going to send you down to Columbia. We’re going to send you down there [to] see if we can’t figure out what makes you tick.”
And they do all kind[s] of psychological reports and things that I’ll talk about in just a moment. And he comes back, and at age 16 is an habitual truant, and he basically drops out of school, and at age 17 he burglarizes the church and steals from the church, and he’s given probation.
And at age 18 he goes to Alabama, and he’s convicted of larceny down there, and he’s sent to jail for two years. And he gets out when he’s age 20, and at 21 he fails to report. They issue a warrant for him. He’s still on probation. And at age 22 he commits a murder and attempted armed robbery.
The solicitor then addressed the evidence in mitigation presented by Hum-phries. The solicitor argued to the jury that there was a complete lack of mitigating evidence, arguing that Humphries had a significant history of prior criminal convictions for crimes of violence and that his relatively young age (twenty-two), mental capacity, and occasional drug and alcohol use were of no moment.
Finally, the solicitor turned to Dickie Smith’s uniqueness as an individual. In this regard, the solicitor stated:
Dickie Smith was born in 1950, fourth son, fifth child of a fellow named Alton Smith and a sweet lady named Lottie Mae Darnell Smith. They grew up poor. They didn’t have hot water. They had a spigot coming in and a tub next to the stove, and they had a few acres of cotton.
Dickie Smith is as much about this case as Shawn Paul Humphries. When Alton Smith died when Dickie was nine, he pulled himself up by his bootstraps and he started contributing to the family. He got all kinds of odd jobs picking cotton at a penny a pound, hunting rabbits, skinning them, dressing them out, selling them for 50 cents.
Wfiien he’s 14 years old, he gets a job in Greenville at the Bi-Lo in the Meat *282 Department working after school. He’s gone to school all day. From after school til about 10:00 or 10:30 at night working at Bi-Lo, saving his money, buying a car for the family.
When he’s in tenth grade, he goes down to Boenett’s and he gets a full-time job, second shift. He’s going to school all day, and he’s working until midnight, contributing. Lottie Mae Darnell Smith with eight kids, got them all out of high school, all at least a tech degree, some of them through college.
When Dickie Smith finished high school, he went to work for Union Carbide, then Kemet, but he didn’t stop there. He kept improving himself. He went to Tech, he got an engineering degree, and he became a supervisor, and then he went back to Tech because he decided he wanted to build houses, and he got his — another degree at Tech, and he got his builder’s license.
And in 1984 he met Pat, and they fell in love, and they got married. That’s the same year Shawn Paul Humphries committed two house break-ins at age 13. In 1986 Dickie makes a pretty drastic move. He decides he’s going to quit Kemet and go build houses full-time, and he goes out, and he starts building homes in the community he had grown up in. That’s the same year Shawn Paul Humphries is up for his second probation violation and sent down to Columbia.
Then in 1988, July the 4th, they have a little baby girl named Ashley. You know, the Defense brought in a 12 year old stepdaughter — stepsister, said, “Please don’t put Shawn Paul Hum-phries in the electric chair.” I’m sorry I did not feel it was appropriate to bring in a six year old girl Ashley and parade her in front of you. In 1988 Ashley is born. That’s the same year Shawn Paul Humphries went to jail for two years. And in the spring of 1992, I believe, Dickie Smith opens the doors to the MaxSaver, building a business down in that community.
You have the right to look at the uniqueness of the individual. I would submit to you that Dickie Smith, by everybody’s description to you was a unique individual. He grew up in that southern part of Greenville County below Simpsonville that was mainly farming, cotton, agriculture area.
And he grew up watching it change to industrial. And he first went to work for one of the industries at Union Carbide, and then he decided he was going to be part of that change, and he started building houses down there and building a business down there.
After finishing the portion of his closing argument concerning Dickie Smith’s uniqueness, the solicitor then concluded his argument by arguing the following to the jury:
Who is the victim here, Shawn Paul Humphries or is it Dickie Smith? Who is the victim? Is it this guy over here or is it Donna, Donna Brashier, who’s got to hear that gunshot every day of her life and who’s got to see Dickie Smith laying on the floor every day of her life? Who is the victim? Is it this Defendant or is it this lady right here, his momma, or his wife, or Ashley, who the only way she can see her daddy is to go visit his grave on Sunday after church?
There are a lot of reasons for punishment. Rehabilitation is one reason, and rehabilitation is a proper goal in some circumstances, but you’ve got to decide about whether this Defendant, who at 13 is breaking the law, at 14 is breaking the law, at 15 is breaking the law, at 17 is going — is breaking the law, at 18 is *283 breaking the law and going to jail, who’s been given every chance that the system offers. You decide if you’re going to rehabilitate him.
What are some other reasons for punishment? Retribution is a reason for punishment. That may not sound good, may not sound right, but, in fact, it is part of punishment, because retribution is our community saying you have done something wrong and we’re going to punish you....
When you look at a case like this, when you look at the aggravation, when you look at the total lack of mitigation, I would submit, when you look at the character of this Defendant, and when you look at Dickie Smith, how profane when you look at all the circumstances of this crime and of this Defendant, how profane to give this man a gift of life under these circumstances....
What punishment do you recommend when a man is defending his co-worker, he’s defending his store, he’s defending what he has built, and he’s ducking behind the counter, and somebody takes a nine millimeter and executes him? What punishment do you recommend? What punishment do you recommend when you’ve got a character like that? What punishment do you recommend when somebody like Dickie Smith is taken from us?
If not now, then when? If not in a case that’s as aggravated as this, then when do you do it? The defense may say, “Well, you can think of all kinds of aggravating cases.” You can think of this and you can think of that. You look at the circumstances of this case.
If not in a case as aggravating as this, if not in a case with absolutely no mitigation like this, if not in a case with a character like this, if not in a case when somebody like Dickie Smith is taken,
then when are you going to do it? It’s not supposed to be easy. It’s never been easy. It won’t be easy in the future.
Shawn Paul Humphries comes into this courtroom asking you for mercy. Shawn Paul Humphries comes in here and asks you for mercy, and I ask you what mercy did he give? Shawn Paul Humphries comes in here and asks you for mercy, and he gave none. Shawn Paul Humphries comes in here and asks you for life, and he gave death. Is that fair? Is that justice? That’s what you’re here for is justice. It’s up to you.
In his closing argument, counsel for Humphries argued that the death penalty was unwarranted for several reasons. First, counsel for Humphries emphasized that there was no evidence of an intent to kill because Humphries: (1) pulled the trigger after he panicked in reaction to Dickie Smith’s attempt to reach under the counter; (2) did not kill Donna Brashier; (3) drove off without Blackwell; and (4) voluntarily confessed to the killing. Counsel also argued that Humphries was a nonviolent person who had no significant history of engaging in violent acts. Counsel argued that Humphries was a young man who had an extensive history of emotional, physical, and substance abuse. Finally, counsel argued that Humphries was a trustworthy, respectful, and pleasant person.
Following the state trial court’s instructions and the jury’s deliberations, the jury recommended a sentence of death. At the post-trial motions hearing, Humphries’s counsel objected to the solicitor’s use of comparisons between Dickie Smith and Humphries during his clos-ing argument, and the state trial court overruled the objection.
On state habeas, Humphries claimed that his trial counsel were constitutionally *284 ineffective for failing to object to the solicitor’s closing argument, which he claimed was inappropriate and prejudicial under Payne. The state habeas court rejected this claim because, in the court’s view, there was no reference to the comparative worth of Dickie Smith and Humphries. The court further noted that Payne actually encourages the prosecution to comment on evidence on record about the life of the victim and about the life of the defendant. Because there was no showing the argument was improper, the court concluded that counsel for Humphries could not be deemed ineffective for failing to object to the solicitor’s closing argument. Hum-phries appealed the denial of state habeas relief to the South Carolina Supreme Court, and that court denied relief, concluding that Humphries’s counsel was not constitutionally ineffective for failing to object to the solicitor’s closing argument because the solicitor’s argument was not improper under Payne and did not render the sentencing phase of Humphries’s trial fundamentally unfair.
II
Our standard for collateral review of a state court’s decision on the merits under 28 U.S.C. § 2254(d) is well-settled. A federal court may not grant a writ of habeas corpus unless the state court’s adjudication of the claim “resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States.” 28 U.S.C. § 2254(d)(1). The phrase “clearly established Federal law,” id., “refers to the holdings, as opposed to the dicta, of the [Supreme] Court’s decisions as of the time of the relevant state-court decision.” Booth-El v. Nuth, 288 F.3d 571, 575 (4th Cir.) (internal quotation marks omitted), cert. denied, 537 U.S. 959, 123 S.Ct. 384, 154 L.Ed.2d 311 (2002). Further, a state court’s decision is “contrary to” clearly established federal law, as determined by the Supreme Court, either: (1) “if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases,” or (2) “if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [Supreme Court] precedent.” Williams v. Taylor, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Finally, “[u]nder the ‘unreasonable application’ clause, a federal habe-as court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court’s decisions but unreasonably applies that principle to the facts of the prisoner’s case.” Id. at 413, 120 S.Ct. 1495. Notably, an “unreasonable application of federal law is different from an incorrect application of federal law,” because an incorrect application of federal law is not, in all instances, objectively unreasonable. Id. at 410, 120 S.Ct. 1495.
Ill
The principal question before this court is whether the South Carolina Supreme Court unreasonably applied Payne to the facts of this case. To properly analyze this question, we must take a close look at the Supreme Court’s precedent concerning victim-impact evidence.
In Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987), the Supreme Court held that the Eighth Amendment prohibits a state from allowing a capital sentencing jury to consider victim-impact evidence. Booth involved the brutal murders of an elderly couple, Irvin and Rose Bronstein. Id. at 497, 107 S.Ct. 2529. During the sentencing phase of the trial, the prosecutor read a victim-impact *285 statement that was compiled by a probation officer on the basis of her interviews with the Bronsteins’ surviving family members. Id. at 498-500, 107 S.Ct. 2529. The victim-impact statement included all three forms of victim-impact evidence: accounts of the emotional and psychological impact of the crime on the family, descriptions of the Bronsteins’ personal characteristics, and the victims’ family members’ opinions and characterizations of the crimes and the defendant. Id. at 499-500, 107 S.Ct. 2529.
In Booth, the Court held that all three forms of victim-impact evidence are irrelevant to a determination of whether to impose a death sentence, and that their admission thus risks arbitrary and capricious imposition of the death penalty. Id. at 502-03, 107 S.Ct. 2529. The Court noted that, because victim-impact evidence includes facts about which the defendant was unaware at the time of the murder, it is unrelated to the defendant’s culpability. Id. at 505, 107 S.Ct. 2529. The Court further noted that admitting victim-impact evidence would yield arbitrary results because victim-impact evidence would lead juries to impermissibly base their decision on their evaluation of the relative worth of the victim, and because the capital sentencing decision would partially depend upon the degree to which the victim’s family members — if the victim leaves any behind — are able to articulate their loss. Id. at 505-06, 107 S.Ct. 2529. Moreover, the Court stated that victim-impact evidence improperly shifts the jury’s focus from the defendant to the victim, and, thus, yields death sentences based on emotion rather than reason. Id. at 507-08, 107 S.Ct. 2529.
In South Carolina v. Gathers, 490 U.S. 805, 109 S.Ct. 2207, 104 L.Ed.2d 876 (1989), the Supreme Court extended Booth to cover a prosecutor’s comments on the murder victim’s personal characteristics. Id. at 811-12, 109 S.Ct. 2207. In that case, in an attempt to enable the jury to more fully comprehend the human loss involved in the murder of a mentally unstable homeless man, the prosecutor made various references in his closing argument at the sentencing phase about the victim’s personality and character, including inferring from the victim’s possession of religious articles and a voter registration card that the victim was a man of faith who cared about his community, reading a prayer written by the victim that was found at the murder scene, and noting that the victim had mental problems. Id. at 808-10, 109 S.Ct. 2207. The Court found that the prosecutor’s statements were “indistinguishable in any relevant respect from that in Booth'” and, thus, likewise violative of the Eighth Amendment. Id. at 811, 109 S.Ct. 2207. According to the Court, while victim-impact evidence relevant to the circumstances of the crime is admissible, the prosecutor’s statements went far beyond those facts. Id. at 811-12, 109 S.Ct. 2207.
In Payne, the Court overruled both Booth and Gathers. The Payne case involved a brutal attack of a mother and her two small children that left the mother and one of her children dead. Payne, 501 U.S. at 812-13, 111 S.Ct. 2597. At the sentencing phase of the trial, the prosecutor presented the testimony of the children’s grandmother, who testified about the effect of the crimes on the now-orphaned child. Id. at 814-15, 111 S.Ct. 2597. Additionally, the prosecutor commented extensively on the impact of the murders on the orphaned child and said that the child will “want to know what type of justice was done” when he is older. Id. at 815, 111 S.Ct. 2597.
In the Payne decision, the Court observed that “a State may properly conclude that for the jury to assess meaningfully the defendant’s moral culpability and *286 blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant.” Id. at 825, 111 S.Ct. 2597. Furthermore, the Court observed that Booth “unfairly weighted the scales in a capital trial; while virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering ‘a glimpse of the life’ which a defendant ‘chose to extinguish,’ ” id. at 822, 111 S.Ct. 2597 (quoting Mills v. Maryland, 486 U.S. 367, 397, 108 S.Ct. 1860, 100 L.Ed.2d 384 (1988) (Rehnquist, C.J., dissenting)), or “demonstrating the loss to the victim’s family and to society which has resulted from the defendant’s homicide.” Id. Consequently, the Court concluded that, “if the State chooses to permit the admission of victim-impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar.” Id. at 827, 108 S.Ct. 1860. Of note, the Payne Court did not alter Booth’s holding that admitting evidence of the victims’ opinions of the crime and of the appropriate sentence for the defendant violates the Eighth Amendment; rather Payne only allows evidence of the victim’s personal characteristics and the harm inflicted upon the victim’s family and community. Id. at 829 n. 2, 111 S.Ct. 2597. The Court in Payne noted that there was “no reason” to treat victim-impact evidence “differently than other relevant evidence,” id. at 827, 111 S.Ct. 2597, but cautioned that, “[i]n the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief.” Id. at 825.
IV
In its decision on state habeas, the South Carolina Supreme Court first held that Payne only prohibited comparisons between the victim and other members (victims) of the community. Humphries, 570 S.E.2d at 167-68. Because no such victim-to-victim comparison was made in the case, the South Carolina Supreme Court held that Payne did not ipso facto prohibit the solicitor’s closing argument. Id. Because Payne did not specifically prohibit victim-to-defendant comparisons, the South Carolina Supreme Court went on to address the question of whether the solicitor’s comments rendered Humphries’s sentencing proceeding fundamentally unfair. The court held:
In our opinion, the solicitor’s closing argument did not render sentencing fundamentally unfair as they did not prejudice Petitioner. The solicitor’s comments were based on evidence already in the record. Smith’s wife and brother testified during the penalty phase regarding each of the facts about Smith’s life upon which the solicitor commented. Petitioner presented the testimony of thirteen witnesses in mitigation during the sentencing phase who attested to Petitioner’s at-risk childhood and subsequent criminal acts as a juvenile and young adult, providing all the evidence of Petitioner’s character discussed by the solicitor in his closing.
Through the testimony of Petitioner and Smith’s family members, both the similarities (the childhood poverty and adversity) and the differences (the manner in which Petitioner and Smith dealt with their circumstances) were readily apparent to the jurors, before the solicitor’s closing argument. As permitted by Payne, the State offered evidence of Smith’s “uniqueness” as an individual by describing the successful ways in which Smith dealt with adversity in his life. Likewise, Petitioner introduced evidence of his own “uniqueness” through the tes *287 timony of thirteen witnesses (compared to Smith’s two witnesses) regarding his own difficult childhood and background, thereby inviting a comparison between Petitioner and Smith’s respective characters even before the solicitor gave his closing remarks. As such, we do not believe the solicitor’s comments were so prejudicial (if prejudicial at all) that they rendered Petitioner’s death sentence fundamentally unfair under the Due Process Clause.
Humphries, 570 S.E.2d at 167-68.
V
Turning to the question of whether the South Carolina Supreme Court unreasonably applied clearly established federal law as determined by the United States Supreme Court, initially it should be noted that the Court in Payne did not set the parameters of what type of victim-impact evidence would render a trial fundamentally unfair under the Due Process Clause of the Fourteenth Amendment. As noted earlier, the Payne Court did observe that courts should handle the admission of victim-impact evidence just like any other relevant evidence. 501 U.S. at 827, 111 S.Ct. 2597. However, the only inkling in Payne on the limitations imposed on the admission of victim-impact evidence is the Court’s citation to Darden v. Wainwright, 477 U.S. 168, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986). Payne, 501 U.S. at 825, 111 S.Ct. 2597.
In Darden, the Court addressed prose-cutorial misconduct at the guilt phase of a capital murder trial. In addressing Dar-den’s argument that his trial and resulting conviction were fundamentally unfair because of the prosecutor’s improper argument, the Court characterized the inquiry as whether the improper comments were so unfair as to make the conviction a denial of due process. Darden, 477 U.S. at 181, 106 S.Ct. 2464. The Darden Court based its due process standard on Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), another prosecuto-rial misconduct case. In considering De-Christoforo’s claim that his first degree murder conviction violated his due process rights, the Court stated that the due process analysis properly addresses more than just the questionable prosecutorial conduct itself. Id. at 639, 94 S.Ct. 1868. Instead, a court making a due process inquiry must consider the challenged conduct in relation to the proceeding as a whole. Id. The analysis of a due process claim premised on unfair prosecutorial conduct may thus depend upon numerous factors, which include the nature of the prosecutorial misconduct, Darden, 477 U.S. at 181-82, 106 S.Ct. 2464, the extent of the improper conduct, DeChristoforo, 416 U.S. at 645, 94 S.Ct. 1868, the issuance of curative instructions from the court, Darden, 477 U.S. at 182, 106 S.Ct. 2464, any defense conduct inviting the improper prosecutorial response, id., and the weight of the evidence. Id.; see also Boyd v. French, 147 F.3d 319, 329 (4th Cir.1998) (holding that a prosecutorial misconduct determination requires the court to look at the nature of the comments, the nature and quantum of the evidence before the jury, the arguments of opposing counsel, the court’s charge, and whether the errors were isolated or repeated). Based on this precedent, it is evident that both Darden and DeChristoforo apply to cases in which the defendant or petitioner alleges that the admission of victim-impact evidence or prosecutorial comment on victim-impact evidence violated his rights under the Due Process Clause of the Fourteenth Amendment.
Under this approach, Humphries’s initial hurdle is to demonstrate that the solicitor’s year-by-year chronology comments were *288 improper.[2] In this regard, the majority does not posit that any one of the solicitor’s comments, standing alone, was improper or factually inaccurate. Rather, according to the majority, the year-by-year chronology comments, collectively, created an impermissible situation in which the solicitor asked for a sentence of death based solely on the relative worth of the lives of Dickie Smith and Humphries.
The fatal flaw in the majority’s analysis is that a victim-to-defendant comparative worth argument is not prohibited by Supreme Court precedent, let alone “clearly established” precedent. For good reason, in fact, even the majority today recognizes that victim-to-defendant comparisons are “inescapable in light of the Payne decision.” Ante at 277.
One of the reasons proffered by the Supreme Court supporting its decision in Payne was that the states have a legitimate interest in introducing evidence of a victim’s personal characteristics and evidence of the harm caused to the victim’s family and society by the defendant’s actions to counteract the mitigating evidence presented by a defendant. 501 U.S. at 825, 111 S.Ct. 2597. Whether the victim-impact evidence counteracts the defendant’s mitigating evidence is a question, asking the jury to make a comparison between the victim-impact evidence and the defendant’s mitigating evidence. In this case, in determining the appropriate sentence, the jury was asked to consider Dick-ie Smith’s personal characteristics, the harm caused to his family and society by Humphries’s actions, and Humphries’s mitigating evidence, which included evidence of Humphries’s personal characteristics, both good and bad. Thus, the solicitor’s year-by-year chronology comments were within the boundaries of a question the jury was required to consider — the blameworthiness of Humphries.
Of course, allowing the introduction of victim-impact evidence does not, and should not, open the door to evidence/argument ultimately allowing the jury to make a comparative inquiry between the victim and other victims in society, as the Court in Payne apparently recognized. Id. at 827, 111 S.Ct. 2597. A victim-to-victim comparison is certainly more pernicious than a victim-to-defendant comparison because, not only does it invite a commentary on collateral evidence not properly before the jury (the worthiness of other members (victims) of society), it does not counteract the defendant’s mitigating evidence, which was one of the main goals of Payne.
Put simply, clearly established Supreme Court precedent does not prohibit victim-to-defendant comparisons; they are inevitable in any capital case in which the jury is asked to assess the persuasive force of the defendant’s mitigating evidence and the victim-impact evidence. A consequence of Payne is that a defendant can be put to death for the murder of a person more “unique” than another, even though the defendant is, in fact, unaware of the victim’s uniqueness. This does give some pause for concern, as does the notion that, under Payne, a sentence of death can turn on the severity of the harm caused to the victim’s family and society, even though the defendant did not know the victim or the victim’s family. However, these are inevitable consequences of the Payne framework; a framework that we, as judges of an inferior court, are without liberty to change.
*289 Because Humphries cannot show that the solicitor’s comments were improper, my analysis could end right here. However, even if we need to get to the issue of prejudice, it is evident that Humphries was not prejudiced by the solicitor’s year-by-year chronology.
In its opinion, the majority posits that, “[gjiven the force” of the solicitor’s year-by-year chronology, it is safe to conclude that at least one juror would have struck a different balance between life and death. Ante at 276. For this reason, the majority concludes, Humphries was prejudiced by the solicitor’s year-by-year chronology.
In my view, the majority’s prejudice analysis is flawed in several respects. First, the record in this case simply belies the court’s claim that the solicitor’s year-by-year chronology was the centerpiece of the solicitor’s argument. It was not. As set forth above, the solicitor’s year-by-year chronology essentially was the manner in which the solicitor chose to present to the jury the argument that Dickie Smith was a unique individual. Within that year-by-year chronology, the solicitor referenced Humphries four times, telling the jury that: (1) “Dickie Smith is as much about this case as ... Humphries”; (2) Hum-phries “committed two house break-ins at age 13”; (3) in 1986 Humphries violated the terms of his probation and was “sent down to Columbia”; and (4) in 1988 Hum-phries went to prison for two years. The bulk of the solicitor’s argument was not, as the majority would have us believe, that Humphries should die because his life was worth less than Dickie Smith’s. Indeed, the majority recognizes that the solicitor did not use the words “comparative worth” or “value” in his year-by-year chronology. Ante at 270. Rather, the bulk of the solicitor’s argument was devoted to the evidence in aggravation, Humphries’s lack of character, the absence of mitigating evidence in the case, and an explanation how these facts, along with the victim-impact evidence, warranted the imposition of a sentence <of death.
To be sure, the portion of the solicitor’s argument dealing with Dickie Smith’s unique personal characteristics is contained in less than four pages of an approximately twenty-eight page transcript of the solicitor’s closing argument, and, during this segment of the solicitor’s closing argument, Humphries is mentioned just four times. Further, after the solicitor made his final reference to Humphries in his year-by-year chronology by telling the jury that in 1988 Humphries “went to jail for two years,” the solicitor followed two sentences later with the reminder to the jury that it had “the right to look at the uniqueness of the individual.” The solicitor then added that “Dickie Smith, by everybody’s description to you was a unique individual.” Moreover, the solicitor essentially concluded his argument by asking the jury to impose a sentence of death because: (1) the evidence in aggravation was overwhelming; (2) there was a complete lack of mitigating evidence; (3) Hum-phries’s character was poor; and (4) “somebody like Dickie Smith [was] taken.” The solicitor’s closing argument, as outlined above, simply did not invite the jury to return a sentence based on the relative worth of the lives of Dickie Smith and Humphries. Rather, the solicitor invited the jury to consider all of the evidence in the record in reaching its verdict. That being the case, it is difficult to see how the solicitor’s year-by-year chronology prejudiced Humphries.
Second, the solicitor’s comments that the majority finds so objectionable were based upon facts established during the trial and were aspects of the trial which were readily apparent to the jury. Indeed, the circumstances of Dickie Smith’s life and the *290 impact of his death on his family were thoroughly presented without contemporaneous objection through the testimony of Randy and Pat Smith. The circumstances of Humphries’s upbringing were thoroughly explored by Humphries’s counsel in the thirteen witnesses called by the defense. Thus, we are not dealing with a situation where the alleged improper comments mislead the jury into thinking the prosecution obtained extrajudicial information not available to the jury. Cf. United, States v. Moore, 710 F.2d 157, 159 (4th Cir.1983) (noting that improper prosecutorial comment might mislead the jury into thinking the prosecution obtained extrajudicial information not available to the jury). Because the solicitor’s year-by-year chronology was based on evidence already before the jury, it is hard to say that Humphries was prejudiced by the solicitor’s comments.
Third, the facts concerning Humphries referred to by the solicitor in his year-by-year chronology were already thoroughly recounted in greater detail in the portion of the solicitor’s closing argument related to Humphries’s character. No objection, even to this date, is being raised concerning this portion of the solicitor’s closing argument. As noted above, the solicitor’s year-by-year chronology contained the following facts relating to Humphries: (1) he “committed two house break-ins at age 13”; (2) in 1986 he violated the terms of his probation and was “sent down to Columbia”; and (3) in 1988 he went to prison for two years. Earlier, however, the solicitor mentioned that Humphries had, at age thirteen, “committed two breaking and en-terings” and was placed on probation. The solicitor pointed out that, because Humphries continued to be disobedient in school, he was brought before the family court on a probation violation and was released with stricter conditions imposed. The solicitor added that, at age fifteen, Humphries violated the terms of his probation and was “sent down to Columbia.” The solicitor also proffered that, at age sixteen, Humphries was “an habitual truant,” who “basically drop[ped] out of school.” The solicitor further noted that, at age seventeen, Humphries burglarized a church. The solicitor noted that, at age eighteen, Humphries went to Alabama and committed a larceny for which he was convicted and imprisoned for two years. Finally, the solicitor noted that, upon his release, Humphries failed to report to the probation office, a warrant was issued, and within a couple of years of his release from prison he committed the murder at issue. Because all of the facts referred to by the solicitor in his year-by-year chronology were facts recounted in greater detail earlier in his closing argument, it is difficult to conclude that Humphries was in any way prejudiced by the portion of the solicitor’s argument related to the unique character of Dickie Smith.
Finally, the evidence in this case concerning the appropriate sentence was not close. The evidence showed that, after Humphries and Eddie Blackwell entered the Max-Saver convenience store, Dickie Smith asked Humphries whether he wanted something hot, and Humphries flashed a stolen gun and replied that he wanted money. While there was evidence that Dickie Smith reached under a counter to pull out a gun, Humphries shot Dickie Smith in the head, killing him. This evidence clearly supported the aggravating factor in the case, that the murder was committed during the commission of a robbery while Humphries was armed with a deadly weapon. The evidence in mitigation proffered by Humphries to counteract the evidence in aggravation was carefully and meticulously attacked by the solicitor. Moreover, that Dickie Smith was a unique person is not subject to serious debate. In *291 short, I harbor no doubt that, notwithstanding the solicitor’s comments that the majority finds so objectionable, a sentence of death would have resulted.
VI
One final word concerning the majority’s opinion. The majority persuasively explains the dangers inherent in comparative worth arguments and why, in theory, they should be prohibited. If we were free from the constraints of § 2254 and Payne, one might agree with much of what the majority has written. Ultimately, however, our standard of review of the South Carolina Supreme Court’s decision is narrow. Because the South Carolina Supreme Court identified the correct legal standard from the Supreme Court’s decision in Payne, Humphries must show that the South Carolina Supreme Court unreasonably applied the Payne decision. Williams v. Taylor, 529 U.S. at 413, 120 S.Ct. 1495. In this case, the South Carolina Supreme Court thoroughly explained why the solicitor’s year-by-year chronology was not improper, let alone, prejudicial under Payne. The majority today simply cannot explain how the South Carolina Supreme Court unreasonably applied the Payne decision and, for this reason, I am constrained to dissent. Accordingly, I would affirm the district court’s denial of the writ.

. The unfortunate circumstances of Hum-phries's upbringing were further confirmed by the testimony of two other witnesses, Ruby Badsen, Humphries’s maternal grandmother, and Lindsay Badsen, Humphries's uncle.

. Because the majority does not suggest that the state trial court improperly admitted any victim-impact evidence, I will confine my analysis to the solicitor’s comments that the majority concludes violated Humphries's rights under the Due Process Clause of the Fourteenth Amendment.